ORESTE CASALE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54287. Filed September 12, 1956.

*Alexander D. Hanko, Esq.*, for the petitioner.
*A. Jesse Duke, Jr., Esq.*, for the respondent.

### OPINION.

RICE, *Judge:* This proceeding involves a deficiency in income taxes of $1,953.14 for the year 1950 determined by the respondent against Oreste Casale.

The sole issue is whether the sum of $6,839.50 paid by O. Casale, Inc., as the annual premium upon an insurance policy on the life of petitioner, represented a distribution to him of a taxable dividend under section 115 (a)[1] of the Internal Revenue Code of 1939 in the year of its payment.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

Petitioner, residing in New York City, New York, filed his individual Federal income tax return for the year in issue with the former collector of internal revenue for the second district of New York on the cash receipts and disbursements basis.

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

During the taxable year, petitioner was the president and principal stockholder of O. Casale, Inc. (hereinafter referred to as the corporation), a New York corporation organized October 1, 1946, owning 98 of the 100 shares of its outstanding stock. The other shares were owned, 1 by his daughter, Philomena Casale, and 1 by an employee, Anna Prugner. Petitioner was also chairman of the corporation's board of directors.

As president of the corporation, petitioner was authorized to receive an annual salary of $20,000. In the years 1947 to 1950, he received as salary the following amounts:

| | |
|---|---|
| 1947 | $20,000.00 |
| 1948 | 11,833.63 |
| 1949 | 8,043.60 |
| 1950 | 7,454.49 |

During the taxable year, the corporation was engaged in the manufacture of topcoats, overcoats, and raincoats for various retail organizations. These organizations purchased their own material, had it cut, then the corporation made it into the finished product.

The corporation's fiscal year ended September 30. Its profit and loss statements for the fiscal years ended in 1947 to 1950, inclusive, showed net profits as follows:

| | |
|---|---|
| 1947 | $28,427.56 |
| 1948 | 19,107.83 |
| 1949 | 1,368.61 |
| 1950 | [1](295.32) |

[1] Indicates a loss.

At the close of each such year, the net profit or loss was transferred to earned surplus on the corporation's books.

At no time since its incorporation did it pay any dividends to its stockholders, either in cash or in stock.

On December 7, 1948, a meeting of the corporation's board of directors was held, at which the following directors were present: Petitioner, Philomena Casale, and Anna Prugner. The minutes of the meeting stated its purpose to be the consideration of a pension plan for petitioner. A resolution was passed authorizing the corporation to enter into a contract with petitioner, whereby it would obligate itself to pay to him, upon certain stated contingencies, a certain monthly income upon his reaching the age of 65 years, or if he should die prior thereto, a certain sum to his nominees or his estate.

At the same meeting, but subsequent to the aforementioned authorization, the following resolution was adopted:

WHEREAS, this CORPORATION has obligated itself to pay a monthly income under certain contingencies to its President and Treasurer, ORESTE CASALE; and

WHEREAS, it is deemed advisable by this Board of Directors that the contingent obligation of the CORPORATION to pay such retirement pension be provided for through retirement income contract issued by a life insurance company;

THEREFORE, BE IT RESOLVED that the President of this CORPORATION or any officer whom he may delegate, is hereby authorized and directed to purchase from The Equitable Life Assurance Society of the United States, for and on behalf of this Corporation, a retirement income contract (10 years certain) on the life of ORESTE CASALE which will provide for the pension payments which this CORPORATION may become obligated to pay to him pursuant to the resolutions adopted today by this Board of Directors; said retirement income contract to provide that all rights of ownership thereof are vested in this CORPORATION and that all payments to be made thereunder shall be made to this CORPORATION.

On the same date, December 7, 1948, the corporation entered into a deferred compensation agreement with petitioner as authorized. The agreement recited that inasmuch as petitioner had rendered to the corporation services in excess of the compensation paid therefor, and as the corporation was indebted to him for a large measure of its success and desired that he continue in his capacity as its president and treasurer, the parties agreed that additional, but deferred, compensation should be paid petitioner for the services rendered by him. It further provided that the deferred compensation should take the form of a pension, under which petitioner was to receive a monthly income of $500, commencing on the December 7th nearest the date upon which he attained the age of 65 years, and to continue throughout the remainder of his life. In the event of his death on or after the due date of the first payment, and before the payments had been made throughout 10 full years, the corporation agreed to continue the monthly payments to his daughters, Philomena and Josephine Casale, and his brother, Alfred Casale, in equal shares, or to the survivor, until the expiration of the 10-year certain period. Petitioner had the right during his lifetime to change the designation of beneficiaries under the agreement, and if none survived him, it was agreed that the payments were to be made to his estate. If he should die before the first payment became due, the corporation agreed to pay to his nominee, or if none, to his estate, the sum of $50,000. Should he voluntarily leave the employ of the corporation against its wishes, prior to the age of 65 years, or such earlier retirement date as might be agreed upon by the parties, or should he, subsequent to retirement, accept employment from any competitor of the corporation without the corporation's consent, then it was provided that petitioner, or his nominees, would forfeit all right to any payments coming due by virtue of the agreement.

On December 7, 1948, the corporation applied to the Equitable Life Assurance Society (hereinafter referred to as Equitable) for a life insurance policy in the principal sum of $50,000 insuring petitioner's life for the benefit of the corporation.

On December 13, 1948, Equitable issued the policy applied for, wherein the petitioner was designated as the insured. An annual premium of $6,839.50, commencing December 7, 1948, and coming due each December 7th thereafter until maturity of the contract, was provided. The December 7th upon which the insured's age at his nearest birthday was 65 years was agreed upon as the maturity date of the policy. It was further provided that prior to maturity, death benefits in the amount of $50,000 in the event of the insured's death, or the cash value of the policy at the end of the policy year in which the insured's death occurred, whichever was greater, were payable to the corporation as beneficiary. Upon maturity, a monthly income payment of $500 was to be made to the insured for life or a 10-year certain period, whichever was longer. The corporation was declared to be the owner of the policy, and was given the following election by virtue of a rider attached thereto:

### SPECIAL ANNUITY PAYMENT PROVISION.

A. Prior to the Maturity Date, the Owner may elect (with the right to revoke such election) to have the income payments provided for on the face of this policy, including any payments for the certain period that may become due after the death of the Insured, made to the Owner. After the Maturity Date, if such an election has become effective and if the Insured is living, the Owner may cancel such election as to subsequent income payments. Any election, revocation or cancellation must be in writing, and shall not take effect until filed at the Society's Home Office.

By an acknowledgment dated February 4, 1949, attached to and made a part of the policy, Equitable noted that an election in accordance with the provisions of the foregoing rider had been made by the corporation.

The corporation possessed the right to assign the policy; the right to change its beneficiary; the right to receive dividends as declared by the insurer; and the right to borrow on the policy in an amount not exceeding its loan value.

At the time of the issuance of the policy the petitioner was 52 years old.

The insurance contract recited the following amounts to be its cash values at the end of each policy year:

| End of policy year Cash or loan value | | End of policy year Cash or loan value | |
|---|---|---|---|
| 1 | $3,050 | 8 | $46,300 |
| 2 | 8,600 | 9 | 53,500 |
| 3 | 14,650 | 10 | 60,650 |
| 4 | 20,300 | 11 | 67,950 |
| 5 | 26,300 | 12 | 75,400 |
| 6 | 32,650 | 13 | 83,050 |
| 7 | 39,300 | | |

The corporation paid the annual premium of $6,839.50 on said insurance policy for the years 1948, 1949, and 1950.

During 1950, the corporation kept its books and reported its income on the cash receipts and disbursements basis. In computing its taxable income for such year, it did not claim a deduction for the premium it paid on the insurance contract, but charged it against earned surplus. The policy was always treated as an asset of the corporation on its books.

During the year in question, petitioner did not include in his gross income any portion of the premium paid by the corporation on the contract of insurance.

In his deficiency notice, respondent made the following determination:

(a) It is held that the premium of $6,839.50 for the year 1950 paid by O. Casale, Inc., to the Equitable Life Assurance Society of the United States for a life insurance policy in the principal sum of $50,000.00 insuring the life of Oreste Casale is the equivalent of a distribution of a dividend and is therefore includible in * * * gross income.

Respondent's determination is based on the theory that the majority stockholder of a closely held corporation receives a distribution equivalent to a taxable dividend when corporate funds, which have been expended for his personal use, bestow upon him an ascertainable economic benefit. He argues that the transaction between petitioner and the corporation, when viewed as a whole, was lacking in bona fides, and, in effect, was no more than a device whereby petitioner purchased a retirement annuity for himself with corporate funds, citing the following cases in support of his argument: *Commissioner* v. *Court Holding Co.*, 324 U. S. 331 (1945); *Higgins* v. *Smith*, 308 U. S. 473 (1940); *Paramount-Richards Th.* v. *Commissioner*, 153 F. 2d 602 (C. A. 5, 1946); and *Casper Ranger Construction Co.*, 1 B. T. A. 942 (1925).

It is well settled, especially in the case of dealings between closely held corporations and their majority stockholders, that the Commissioner may look at the actualities of a transaction, and upon a determination that the form used to carry it out is unreal or a sham, may sustain or disregard its effect as best serves the purpose of the tax statute; *Higgins* v. *Smith*, *supra*. It is equally well settled that where a dominant stockholder withdraws or disburses corporate funds for his personal use, there being no intention of repayment, the amounts so disbursed are the equivalent of corporate distributions, the formality of the transaction notwithstanding. *Louis Greenspon*, 23 T. C. 138 (1954), reversed on other grounds 229 F. 2d 947 (C. A. 8, 1956); *Charles A. Rogers*, 38 B. T. A. 16 (1938), affd. 111 F. 2d 987 (C. A. 6, 1940); *C. W. Murchison*, 32 B. T. A. 32 (1935); and *L. J. Christo-*

*pher et al.*, 13 B. T. A. 729 (1928), affd. 55 F. 2d 527 (C. A., D. C., 1931).

Hence the pivotal point for decision in the case before us is whether or not the transaction, whereby the compensation agreement was executed and the insurance contract purchased, was a sham for tax purposes.

Had petitioner taken out the policy, and provided that its benefits were to be paid either to him or his designated beneficiaries, and had the corporation merely paid the annual premiums as they became due, such annual payments would have constituted income to petitioner. *Paramount-Richards Th., supra;* and *Casper Ranger Construction Co., supra.* Although that is not the factual situation before us, the distinction between that result and the result here is so slight as not to be material. We recognize that the policy was taken out upon application of the corporation and was carried on its books as a corporate asset. We further recognize that all benefits due under the insurance contract were payable directly to the corporation, and that any future payments to be made to petitioner technically would go to him from the corporation and not from the insurer. However, by virtue of the compensation agreement, petitioner was given the right to designate the beneficiaries of either the death benefits or the retirement income payments which might be due him, and was also given the right to change any such designations.

Considering the features of the policy in conjunction with the provisions of the compensation agreement, we must conclude that the corporation was no more than a conduit running from the insurer to petitioner, or his beneficiaries, with respect to any payments which might come due under the insurance contract. Essentially, petitioner stood in the same relationship to the policy as if he had taken it out himself and the corporation had paid the premiums for him. The similarity in terms between the policy and compensation agreement affords recourse to no other conclusion.

The necessity for such a conclusion becomes more apparent when we consider the position petitioner occupied in relation to the corporation. For all practical purposes he was the corporation. He maintained complete dominion and control of its every move; and any future disposition of insurance proceeds would be subject to his assent and approval.

Petitioner contends that had the corporation chosen to fund the agreement by the accumulation of a cash reserve, or by investment of its funds in the purchase of securities, he would not then be deemed to have received a taxable distribution; and he therefore concludes, there being no distinction between that method of funding the agreement and the one herein involved, that the premium payment should not be considered as representing a taxable distribution. Such an

argument overlooks the fact that the insurance contract immediately inured to petitioner's benefit, while a cash accumulation or purchased securities would not in the absence of some further act, but would remain a general asset until actual distribution or liquidation. Upon payment of the first premium, petitioner received an immediate economic benefit in the form of a $50,000 life insurance estate, and a retirement annuity contract.

Petitioner further argues that his rights under the compensation agreement were subject to forfeiture in the event he left the employ of the corporation prior to retirement at age 65, or entered into competition with it thereafter. Because of such provisions, he contends that we should consider the benefits provided for by the agreement as conditional until the year of their actual cash receipt, and therefore not taxable in the year in issue.

As a practical matter, petitioner's rights under the compensation agreement were not of a forfeitable nature during the taxable year. This is the only conclusion which can be drawn from those paragraphs of the agreement which set forth the conditions of forfeiture, these being couched in the following language:

FIFTH: CASALE and any person or persons designated by him to receive the above mentioned pension payments after his death and his estate shall forfeit all right to the said pension payments if the said CASALE voluntarily leaves the employ of this CORPORATION, *against the wishes of this CORPORATION*, prior to the date upon which he attains the age of 65 years, or such earlier date for his retirement *as may be agreed upon*.

\* \* \* \* \* \* \*

SEVENTH: If, subsequent to his retirement, CASALE accepts employment from any competitor of this CORPORATION, *without the consent of this CORPORATION*, all right to any further pension payments hereunder shall be forfeited by him and by any person or persons designated by him to receive such payments and by his estate. [Emphasis supplied.]

To sustain petitioner's argument of forfeitability in the light of the record would be a gross distortion of fact. As he controlled the corporation by virtue of his stock ownership, his assent was the corporation's assent, his wishes the corporation's wishes. He, in fact, did nothing more than agree not to leave the corporation before the age of 65, or enter into competition therewith, unless he should decide to do otherwise. Conditions of such a nature are mere recitations having no substance or meaning.

In short, we conclude that petitioner failed to maintain an arm's-length relationship in dealing with his corporation. As we said in *Wilhelmina Dauth*, 42 B. T. A. 1181, 1189 (1940):

The test to determine whether a transaction is a bona fide transaction is described by the term "arm's length", or, in other words, Was the transaction carried out in the way that the ordinary parties to a business transaction would deal with each other?

An attempt to fit the transaction before us into such a framework would be extremely difficult, if not impossible. Though the compensation agreement recited that for "many years" petitioner had rendered services to the corporation in excess of the compensation paid therefor, such was not the case. In fact, the corporation had only been in existence for 2 years at the time the agreement was executed; and, since there is nothing in the record to the contrary, we must presume petitioner's salary to have been adequate in relation to the services rendered therefor. Considering the brief relationship between the parties, the failure of the corporation to declare dividends, and the liberal benefits provided by the agreement, we cannot say that these were "ordinary parties to a business transaction."

Looking beyond the formal recitations of the compensation agreement and the insurance contract to their practical effect, we conclude that the transaction, when viewed in its entirety, lacked bona fides and was merely a device whereby petitioner attempted to avail himself of corporate funds without incurring a tax upon their use. To hold otherwise would require that we ignore the realities of the situation. We, therefore, hold that the sum of $6,839.50 paid by the corporation as the annual premium upon the insurance contract represented a distribution to him equivalent to a taxable dividend in 1950.

*Decision will be entered for the respondent.*