Robert V. SANDERS and Nancy Ritter Sanders, Plaintiffs,

v.

Charles I. FOX, Director of Internal Revenue, Defendant.

Kimball J. CRANNEY and Janice J. Cranney, Plaintiffs,

v.

Charles I. FOX, Director of Internal Revenue, Defendant.

N. V. SANDERS and Clover J. Sanders, Plaintiffs,

v.

Charles I. FOX, Director of Internal Revenue, Defendant.

Nos. C89–56, C90–56, C91–56.

United States District Court
D. Utah, Central Division.
April 3, 1957.

Thornley K. Swan and C. Preston Allen, of Ray, Quinney & Nebeker, Salt Lake City, Utah, for plaintiffs.

A. Pratt Kesler, U. S. Atty., Salt Lake City, Utah, and James P. Garland and David R. Frazer, Attys., Dept. of Justice, Washington, D. C., for defendant.

KERR, District Judge.

The above cases were consolidated for trial for the reason that the issues of fact and law are common in each case.

Through these actions plaintiffs seek to recover income taxes paid for the years 1949, 1950 and 1951 in the combined amount of $8,750.20, together with interest thereon.

For convenience I will refer to the plaintiffs as "taxpayers", the defendant as "Director" and the Clover Club Foods Company, a Utah corporation, as "Corporation".

The sole question for determination is whether premiums paid by Corpora-

tion on insurance taken out on the lives of its four stockholders are equivalent to distributions of corporate dividends and taxable to the individual stockholders within the meaning of Section 115, Internal Revenue Code of 1939. It is appropriate at the outset to quote the applicable provisions of the Revenue Code (26 U.S.C., 1952 Ed., Section 115):

"§ 115. Distributions by corporations—(a) Definition of dividend.

"The term 'dividend' when used in this chapter (except in section 201(c) (5), section 204(c) (11) and section 207(a) (2) and (b) (3) (where the reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

"(b) Source of distributions.

"For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113." * * *

The facts are stipulated and are not in dispute. They may be summarized as follows:

During the taxable years in question the taxpayers were the sole stockholders in the Corporation; N. V. Sanders was President of the Corporation and his wife, Clover J. Sanders, was Vice President, Secretary and Treasurer; Kimball J. Cranney was Salesmanager of the Corporation and Robert V. Sanders was employed part time as a general worker. In 1949 N. V. Sanders and his wife, Clover J. Sanders, each owned 43% of the stock of the corporation; Kimball J. Cranney and Robert V. Sanders each owned 7%; in 1950 N. V. Sanders and Clover J. Sanders each owned 40% of the stock and Kimball J. Cranney and Robert V. Sanders each owned 10%; in 1951 N. V. Sanders and Clover J. Sanders each owned 37% of the stock and Kimball J. Cranney and Robert V. Sanders each owned 13%.

On March 23, 1949, the Taxpayers entered into a Stock Purchasing Agreement with the Corporation. This agreement provided that insurance was to be taken out on the lives of the stockholders according to a schedule attached to the agreement. The agreement provided the Corporation would pay the premiums and be designated the owner of the policies during the lifetime of the insured. The insured stockholder was to designate the beneficiary. I quote two paragraphs of the Agreement:

"8. For the purposes of this Agreement, the 'value' of all of the outstanding stock of the Corporation shall be fixed from time to time by resolutions passed at duly called meetings of the Stockholders by the unanimous vote of the Stockholders voting at each such meeting, which valuations shall not include the cash surrender value of or any other value for the insurance policies then subject hereto. At the death of a stockholder, the value of his stock shall be the value shown in the last resolution voted by the stockholders. If the Stockholders voting at any such meeting shall be unable to unanimously agree on the value of said stock, they shall by a resolution

passed by a majority vote of the Stockholders voting at such meeting, appoint three (3) disinterested arbitrators in such manner as shall be provided for in said majority vote, and the value agreed upon by any two (2) of the arbitrators thus appointed shall be binding upon all the parties to this Agreement.

"Until the next meeting of the Stockholders the value of all the outstanding stock of the Corporation shall be $225,000.00, and each share shall have a value proportionate thereto.

"The Resolution to be adopted at said meetings shall be in the following form:

"'Resolved, That the value (for the purposes of Section 8 of Stock Purchase Agreement dated Mar. 23–1949) of all the outstanding stock of the Clover Club Foods Company Corporation shall be $225,000.00, and that each outstanding share of stock shall have a value proportionate thereto, said valuation to be effective from Mar. 23–1949, and to continue until changed by the Stockholders in accordance with the terms of said Stock Purchase Agreement.'

"At the death of a Stockholder, the Adjusted Price to be paid for his stock shall be the greater of the following: (1) the value thereof, hereinabove stated, plus a percentage of the cash surrender value, as of the day prior to his death, of all the insurance policies (including those on his life) equal to the percentage of all the shares of stock of the Corporation which were then owned by him, or (2) the amount of the said insurance proceeds payable under the terms of the said policy or policies on decedent's life."

"11. *It is agreed that all premiums on the insurance policies subject hereto shall be paid out of current corporate earnings or surplus which, but for the payment of such premiums would be available for distribution as dividends;* so that rights of corporation creditors will not be prejudiced by use of corporate funds for payment of such premiums. It is further agreed that so long as this agreement continues, the said insurance policies and all values therein, shall constitute a special reserve for the purpose of enabling the corporation to acquire, under the terms of Section 5 hereof, stock of any stockholder who dies. If, at the time any premium on such insurance policies becomes payable, the corporation has no current earnings, or surplus, available for payment of such premiums this agreement shall terminate, and the beneficiary of the said insurance policies shall be changed to the corporation so that the corporation may hold said policies as ordinary assets to be retained or disposed of as the corporation may decide.

"It is further agreed that any purchase by the corporation of its own Stock, with funds other than said insurance proceeds, as provided in Sections 6 or 9 hereof, shall be made only out of earnings or surplus of the corporation, the use of which will not prejudice corporation creditors. If the corporation is unable to make such purchase, then the stockholders (other than the one whose stock is involved in the sale) may jointly, as individuals, exercise all rights of the corporation in respect to purchase of such stock; and if they exercise said right, they shall assume responsibility for the purchase price and acquire said stock in the same respective proportions as the number of shares of stock in the corporation which each of them had prior to such sale bears to the number of shares which all of them had prior to said sale."

I construe the provisions of the agreement to mean that the beneficiary not only gets the fair market value of the stock as determined by the stockholders, but he also gets a pro rata percentage of the cash surrender value of all the insurance policies as of the day prior to decedent's death. It will be noted that if the stock should become of little value, the beneficiary would still receive the full proceeds taken out on the life of the decedent.

The Agreement provided that upon the death of the insured stockholder the beneficiary would receive the insurance proceeds on the condition that the beneficiary would sell the stock of the decedent to the Corporation at an adjusted price determined by the stockholders. The Agreement also provided that upon the death of a stockholder the adjusted price to be paid for his stock would be the greater of the following: (1) the value of the stock (as set out in the Agreement) plus a percentage of the cash surrender value, as of the day prior to his death, of all insurance policies (including those on his life) equal to the percentage of the shares of stock which were then owned by him; or (2) the amount of the proceeds payable under the terms of the policies on decedent's life.

The Agreement provided for the purchase by the Corporation out of the earnings and surplus any additional shares held by a decedent over and above the amount that could be purchased from the insurance proceeds. In the event the Corporation is unable to make such purchase out of the earnings and surplus, then the other stockholders may exercise all of the rights of the Corporation and purchase decedent's stock. On the other hand, if the stockholder decides to sell his stock he must first give the Corporation sixty days' notice and the privilege of purchasing at the stated price.

Each of the taxpayers, pursuant to the terms of the Agreement, endorsed his certificates in blank, later delivered them to the Corporation with the following statement written across the face of each certificate: "This certificate is held subject to Stock Purchase Agreement dated March 23, 1949". This assignment did not jeopardize the right of the stockholder to vote his stock or to collect dividends thereon.

The parties agree the policies of insurance were applied for and issued on the lives of the taxpayers and were in full force and effect during the three tax years in question. Likewise, it is not in dispute that all the premiums on the policies were paid by the Corporation out of current earnings.

The earned surplus of the Corporation during the tax years in question was as follows:

> 1949 — $ 84,587.77
> 1950 — 122,289.80
> 1951 — 140,853.33.

It is admitted that no dividends were paid to the stockholders for the above years, unless the premiums paid on the policies are to be treated as constructive dividends.

The Corporation did not claim the premiums as a deduction for income tax purposes but accounted for these premiums as an asset on its balance sheets. Neither did the taxpayers include any portions of the premiums paid by the Corporation in their own taxable income.

During the years in question the Corporation paid to its officers an average annual salary, as follows:

| | |
|---|---|
| N. V. Sanders | $38,358.67 |
| Clover J. Sanders | 9,220.34 |
| Kimball J. Cranney | 29,548.34 |
| Robert V. Sanders | 2,774.52. |

After a review of the tax returns the Director redetermined the income tax

liability of the taxpayers and increased their reported gross income in amounts hereinafter set forth. The Director arrived at these amounts by applying a percentage factor equal to taxpayers' combined proportionate holdings in the outstanding stock in the Corporation against the total premiums paid by the Corporation on the policies of life insurance issued to stockholders. This redetermination increased the reported gross income of taxpayers as follows:

1949 – – – $ 3,501.98
1950 – – –   3,673.41
1951 – – –   3,906.60

Total  $11,081.99.

The redetermination resulted in taxpayers being assessed income tax deficiencies and interest as follows:

|   | Year | Deficiency | Interest | Total |
|---|------|-----------|----------|-------|
| A. | 1949 | $1,818.24 | $ 518.20 | $2,336.44 |
| B. | 1950 | 2,072.52 | 466.32 | 2,538.84 |
| C. | 1951 | 2,389.48 | 394.26 | 2,783.74 |
|   |   | $6,280.24 | $1,378.78 | $7,659.02 |

On December 31, 1954, taxpayers paid the deficiencies, together with interest assessed. On June 14, 1955, taxpayers filed with the Commissioner claims for refund and later, on November 28, 1955, taxpayers filed amended claims for refund on the amount paid. The claims for refund were rejected by the Commissioner on February 28, 1956, and these actions followed.

The Corporation is closely held—it could well be termed a family corporation. In 1949 three members of the Sanders family owned 93% of the stock. In 1950 they owned 90% and in 1951 they owned 87% of all the outstanding stock.

Taxpayers contend the purpose of the agreement was calculated to relieve the burden from the Corporation of gathering funds when a stockholder dies; that no distributions are made until a stockholder dies; that they receive no cash increment as individual stockholders; that upon the death of a stockholder his stock is conveyed and complete ownership is received by the Corporation in exchange for the value of the insurance; that the amount received by the heirs of the deceased stockholder is identical with the fair market value of the stock transferred to the Corporation; that the heirs will receive the fair market value of the stock, and the Corporation can select the person to fill the shoes of the deceased stockholder; that it can use the stock acquired to attract skilled, cooperative and efficient management personnel; that the stock purchase agreement constituting the subject of this controversy affords this security and permanency to the continued successful existence of this small but highly successful enterprise.

The law is well settled, especially in dealings between closely held corporations and their majority stockholders, that the Commissioner may look at the actualities of a transaction and view the entire substance to determine the tax consequences. The incidence of taxation depends upon the substance of the transaction. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

Hence the pivotal point for decision in this case is whether the stockholders, the Corporation, or both, derive benefits from the Corporation paying the premiums on the insurance issued on the lives of the stockholders in accordance with the terms of the agreement. For all practical purposes it might be stated the four stockholders were the Corporation; they maintained complete dominion and control over the insurance

policies and the issued stock except to allow the stockholder to name the beneficiary. In a recent decision (September 12, 1956) the Tax Court had occasion to decide a similar situation where the Corporation had paid the premiums on an insurance policy written on the life of the President and principal stockholder of the corporation. The Tax Court stated in the case of Casale v. Commissioner of Internal Revenue, 26 T.C. 1020:

> "To sustain petitioner's argument of forfeitability in the light of the record would be a gross distortion of fact. As he controlled the corporation by virtue of his stock ownership, his assent was the corporation's assent, his wishes the corporation's wishes. He, in fact, did nothing more than agree not to leave the corporation before the age of 65, or enter into competition therewith, unless he should decide to do otherwise. Conditions of such a nature are mere recitations having no substance or meaning."
>
> \* \* \* \* \* \*
>
> "Looking beyond the formal recitations of the compensation agreement and the insurance contract to their practical effect, we conclude that the transaction, when viewed in its entirety, lacked bona fides and was merely a device whereby petitioner attempted to avail himself of corporate funds without incurring a tax upon their use. To hold otherwise would require that we ignore the realities of the situation. We, therefore, hold that the sum of $6,839.50 paid by the corporation as the annual premium upon the insurance contract represented a distribution to him equivalent to a taxable dividend in 1950."

Turning now to the question of the flow of benefits, if any, by reason of the insurance issued, a review of the entire record discloses several benefits inuring equally to the stockholders and the Corporation. A definite fund is created out of which the beneficiary will be paid promptly for the stock. I am aware that stock held in a closely held small corporation does not generally find a ready market. Under the agreement the beneficiary is guaranteed the *fair market price* of the stock with ready cash to pay any necessary expenses. Too, it might be added the agreement directly assists to fix the value of decedent's stock for estate tax purposes and could well limit the estate liability and expedite the settlement of the estate. For a full and complete discussion of this advantage see Wilson v. Bowers, 2 Cir., 57 F.2d 682, and cases cited.

I will not close the discussion on the agreement without mention of one benefit accruing to the Corporation. The Corporation is assured of keeping its stock intact. In addition, as each stockholder dies the Corporation becomes the owner of decedent's stock, which in turn results in a larger portion of the capital and surplus being owned by remaining stockholders, which could well produce a substantial return to taxpayers who are incidentally the remaining stockholders of the Corporation.

Counsel agree there has never been a case decided on a set of facts precisely to those present in the case at bar. There are cases, however, covering the payment of premiums by closely held corporations on the lives of its stockholders. In Paramount-Richards Theatres v. Commissioner of Internal Revenue, 5 Cir., 153 F.2d 602, the court stated at page 604:

> "The issues presented on these consolidated appeals are interrelated: First. Did taxpayer corporation's payments of insurance premiums represent dividend distribution under Section 115 of the Revenue Act of 1938 and the Internal Revenue Code, 26 U.S.C.A.Int.Rev. Code § 115, or was it deductible business expenses under Section 23(a), 26 U.S.C.A.Int.Rev.Code, § 23(a)? Second. Was taxpayer Richards taxable on the portion of the premium payments allocable to

his stock interest in taxpayer corporation?

"The Tax Court determined that both Paramount Pictures, Inc., and Richards benefited from the agreement:

" 'If, during the five-year period, Richards had died before the $250,-000 of insurance had been procured on his life, and Paramount Pictures Inc., had exercised its option to purchase his Class A stock, the amount to be paid for the stock was to be $250,000 more than if the insurance had been obtained. *From this, it appears that it was expected that both Richards and Paramount Pictures, Inc. would be benefited, and equally so, by reason of the insurance.* Since Richards and Paramount Pictures Inc. were equal owners of the stock of Paramount-Richards Theatres, Inc., and they caused it to pay the premiums on the insurance from which they expected to be benefited equally, we think the amounts of the insurance premiums represented distributions made to them, in equal amounts, by their corporation, and are taxable to them as dividends. Since Richards was the beneficial owner of only three-fourths of the one-fourth of the stock of which he was the record owner, only three-eighths of the premiums paid each year constituted income to him.' [Emphasis supplied]

"We agree with the Tax Court."

In the above case the court held Richards was taxable on the proportionate amount of premium payments allocated to his stock interest because he benefited from the agreement.

In the case of Hadley v. Commissioner of Internal Revenue, 59 App.D.C. 139, 36 F.2d 543, the court said at page 544:

* * * "While there was no declaration of a dividend in this case, there was a determination of the amount of profits or earnings to which the respective stockholders

were entitled. One stockholder was paid his share in cash. The shares of the others were credited to their respective accounts on the books of the corporation in such a manner as to bring the fund within the absolute and unqualified dominium and control of the stockholder. While, technically speaking, this would not amount to the declaration of a dividend, it would amount to a distribution of the assets in such manner that the theory of corporate entity is not affected or disregarded, *since it is settled law that the division of profits of a corporation among its stockholders amounts to a constructive dividend whether it is intended by the directors or stockholders to constitute a dividend or not.*" (Emphasis supplied.)

In addition to what has already been said it might be noted the following cases discuss the question of constructive dividends: Chattanooga Sav. Bank v. Brewer, 6 Cir., 17 F.2d 79, certiorari denied 274 U.S. 751, 47 S.Ct. 764, 71 L.Ed. 1332; Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527; Fitch v. Helvering, 8 Cir., 70 F.2d 583; Lomb v. Sugden, 2 Cir., 82 F.2d 166; Phelps v. Commissioner, 7 Cir., 54 F.2d 289, certiorari denied 285 U.S. 558, 52 S.Ct. 458, 76 L.Ed. 946; Regensburg v. Commissioner, 2 Cir., 144 F.2d 41, certiorari denied 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625; Third Nat. Bank v. United States, D.C., 64 F.Supp. 198; Salt, Estate of Salt v. Commissioner, 17 T.C. 92; Weil, Estate of Weil v. Commissioner, 22 T.C. 1267.

Taxpayers in support of their contention place great reliance upon Emeloid Co., Inc., v. Commissioner of Internal Revenue, 3 Cir., 189 F.2d 230; Lihme v. Reinecke, 7 Cir., 59 F.2d 633; Frank P. Holloway v. Commissioner of Internal Revenue, 6 Cir., 203 F.2d 566; Wilson v. Commissioner of Internal Revenue, 5 Cir., 219 F.2d 126; Ward v. Commissioner of Internal Revenue, 9 Cir., 58 F.2d 757; Curran v. Commissioner of Internal Revenue, 8 Cir.,

49 F.2d 129, and Commissioner of Internal Revenue v. Snite, 7 Cir., 177 F.2d 819. Suffice it to say I can not square these cases with the admitted facts in the case at bar.

It appears to me that the import of Section 115, supra, makes no distinction in the method which a taxpayer may exercise by which the fruits may be attributed to a different tree from that on which they grew.

From what I have said, I hold the premiums paid on the insurance policies by the Corporation constituted constructive dividends to the taxpayers and the Commissioner was correct in his decision in rejecting the claims for refund.

Counsel for defendant will prepare findings of fact and conclusions of law, allowing the plaintiffs proper exception thereto, together with judgment, and submit same within twenty (20) days from and after the date of this memorandum, and the clerk will enter an order accordingly.