253 F.2d 855
 Robert V. SANDERS and Nancy Ritter Sanders, Appellants,
v.
Charles I. FOX, Director of Internal Revenue, Appellee.
Kimball J. CRANNEY and Janice J. Cranney, Appellants,
v.
Charles I. FOX, Director of Internal Revenue, Appellee.
N. V. SANDERS and Clover J. Sanders, Appellants,
v.
Charles I. FOX, Director of Internal Revenue, Appellees.
 Nos. 5718-5720.
 United States Court of Appeals Tenth Circuit.
 March 20, 1958.
 
 C. Preston Allen, Salt Lake City, Utah (Albert R. Bowen and Thornley K. Swan, Salt Lake City, Utah, were with him on the brief) for appellants.
 James P. Turner, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum and David O. Walter, Attys., Dept. of Justice, Washington, D. C., and A. Pratt Kesler, U. S. Atty., Salt Lake City, Utah, were with him on the brief), for appellee.
 Before MURRAH, LEWIS and BREITENSTEIN, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 Appellants, owners of all the issued stock of the Clover Club Foods Company,[1] have entered into an agreement with the corporation for the redemption of their stock under a plan funded by insurance carried upon the lives of the stockholders. The insurance premiums, paid by the corporation, have been assessed against appellants as constructive dividends constituting ordinary income. The validity of this assessment is the sole question here presented. The cases, consolidated as involving the same facts and identical issues of law, reach us upon appeal from the District Court for the District of Utah, the trial court having denied claim to refund upon taxes so assessed and paid for the years 1949, 1950 and 1951. The controversy arises from stipulated facts. See 149 F.Supp. 942.
 
 
 2
 Clover Club Foods Company, a Utah corporation manufacturing potato chips, at all pertinent times had four stockholders, present appellants: N. V. Sanders, his wife Clover J. Sanders, their son Robert V. Sanders and K. J. Cranney. N. V. Sanders was president of the corporation and his wife was vice president, secretary and treasurer. Robert V. Sanders was employed by the corporation as a general worker. Cranney was the sales manager. Each drew salary from the corporation and held stock interest which varied during the three years in question. In 1949, N. V. Sanders and his wife owned 43% each of the issued stock; in 1950, 40% each and in 1951, 37% each. Robert V. Sanders and Cranney each held 7% in 1949, 10% in 1950 and 13% in 1951.
 
 
 3
 On March 23, 1949, the corporation and its four stockholders executed a "Stock Purchase Agreement." The agreement was funded by insurance taken out upon the lives of the stockholders through individual policies closely, although not exactly, proportionate in amount to the corporate interest of the stockholder. The policies were deposited with the corporation with all lifetime benefits reserved, by endorsement of the policies[2] and by contract provision,[3] to the corporation. Each shareholder deposited with the corporation his corporate stock, endorsed in blank but without surrender of the right to sell or vote the stock or receive dividends thereon. The shareholder had the exclusive right to name the beneficiary of the insurance proceeds payable at death.
 
 
 4
 Upon the death of a stockholder the corporation agreed to deliver the policy to the named beneficiary for collection. Thereupon the corporation would transfer to itself as much of the company stock standing in the name of the deceased as could be purchased at a pre-determined price from the insurance proceeds. The fair market price of the stock was to be determined from time to time by unanimous vote of the stockholders (or by arbitration if necessary) and the redemption price was designated in the agreement:
 
 
 5
 "At the death of a Stockholder, the Adjusted price to be paid for his stock shall be the greater of the following: (1) the value thereof, (as set by the stockholders) plus a percentage of the cash surrender value, as of the day prior to his death, of all the insurance policies (including those on his life) equal to the percentage of all the shares of stock of the Corporation which were then owned by him, or (2) the amount of said insurance proceeds payable under the terms of the said policy or policies on decedent's life."
 
 
 6
 If the insurance payment was not sufficient to buy all of the deceased's stock at the adjusted price the corporation had a sixty-day option to do so from funds available in current earnings or surplus. Shares not so purchased remained the property of the record owner as reflected upon the company books subject to a secondary option to purchase upon the part of the surviving stockholders.
 
 
 7
 The corporation provisionally[4] agreed to pay the insurance premiums as they became due and has paid total premiums for the years designated in the following amounts: 1949, $4,072.08; 1950, $4,591.77; 1951, $5,279.20.
 
 
 8
 As the agreement required, these premiums were paid from current earnings and surplus "so that rights of corporation creditors will not be prejudiced by use of corporate funds for payment of such premiums." The premium payments have not been claimed by the corporation as a tax deduction but have been carried as an asset on the company balance sheet. No formal dividends have been declared or paid for the tax years in question although earned surplus in 1949 was $84,587.77, in 1950, $122,289.80 and In 1951, $140,853.33. The outstanding stock was valued at $225,148 in 1949 and 1950 and at $285,124 in 1951.
 
 
 9
 Other provisions in the "Stock Purchase Agreement" determine the rights of the parties when a stock purchase is not consummated by the contingency of the death of a stockholder. Should the corporation be unable to make premium payments from earnings or surplus the agreement terminates and the corporation becomes sole beneficiary of the insurance and its value becomes an ordinary asset of the company. See note 4, ante. If during his lifetime, the stockholder desires to sell his stock he has such right subject to the corporation's first right of refusal at the adjusted price set in the agreement. The agreement terminates if the corporation does not purchase and the company becomes beneficiary of all the insurance and vested with all the incidents of ownership in the policies. If the corporation does purchase, the company becomes the beneficiary of the particular policy covering the life of the withdrawing stockholder and might, at company option, allow such stockholder to purchase the insurance at its then cash value.
 
 
 10
 Considered apart from tax incidents, stock redemption plans between a closely held corporation and its stockholders, buy-out agreements such as here considered, may present advantages to both company and stockholder. Continuity of stock control, management and the concomitant security given company personnel and creditors may benefit the corporation. Assurance of a sale of stock at an agreed price where otherwise such stock might be unmarketable gives comfort to the stockholder. These and other benefits as intangibles are admittedly without tax significance. But where, as here, the benefits are presently set by contract a present or potential tax impact becomes apparent. Appellants urge that the instant agreement presents but a potential tax against company, surviving stockholders, estate, or insurance beneficiary upon actual redemption of the stock. And since under the posture of the case presented no eventuality possible under the stock purchase agreement did occur during the years 1949, 1950 or 1951 except the continuing payment of insurance premiums by the corporation we agree that our present inquiry is limited to whether or not a taxable incident occurred to appellants during the years in question by such payments.
 
 
 11
 The trial court, placing reliance upon the reasoning of the Tax Court in Casale v. C. I. R., 26 T.C. 1020, since reversed, 2 Cir., 247 F.2d 440, 441, concluded that the premium payments constituted, in effect, a division of profits by the corporation and were taxable as constructive dividends to appellants. To support the holding, appellee urges that the test of taxability lies in an analysis of the benefits flowing to corporation and stockholder, and, pointing out that the stockholder (beneficiary) under the instant agreement cannot receive less and may receive considerably more than the actual value of his stock, asserts that the agreement is essentially for the benefit of the stockholder. We believe the correct rule must limit the analysis to those benefits "presently realized" for the purpose of present inquiry.
 
 
 12
 Although the term "constructive dividend" is not known to the Internal Revenue Code[5] tax consequences have been recognized far beyond the rudimentary doctrine that gain is realized only through an exchange of cash. Helvering v. Brunn, 309 U.S. 461, 60 S.Ct. 631, 84 L.Ed. 864. As stated in Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 146, 85 L.Ed. 75, 131 A.L.R. 655:
 
 
 13
 "* * * (T)he rule that income is not taxable until realized has never been taken to mean that the taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive the income, can escape taxation because he has not himself received payment of it from his obligor. The rule, founded on administrative convenience, is only one of postponement of the tax to the final event of enjoyment of the income, usually the receipt of it by the taxpayer, and not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of money or property. * * * This may occur when he has made such use or disposition of his power to receive or control the income as to procure in its place other satisfactions which are of economic worth."
 
 
 14
 Thus, in determining whether or not taxable income accrued to the stockholder, the courts regard the substance of the transaction, Jones v. Dawson, 10 Cir., 148 F.2d 87, and a distribution which is in effect a present dividend of profits by a corporation is taxable individual income of the stockholder. Rockefeller v. United States, 257 U.S. 176, 42 S.Ct. 68, 66 L.Ed. 186; Palmer v. Commissioner, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50; Hirsch v. Commissioner, 9 Cir., 124 F.2d 24; McGuire v. Commissioner, 7 Cir., 84 F.2d 431. But the doctrine has limitations and has never been held to include simple appreciation of stock value whether caused by internal corporate-stockholder buy-out agreements or ordinary corporate prosperity.
 
 
 15
 The use of insurance policies by a corporation as additional compensation to employees, to protect the company against financial loss by reason of the death of a key employee, or to provide for the retirement of the employee has been the subject of a number of recent tax cases. These cases demonstrate the alternative rules that if the corporation pays premiums on a policy on the life of an employee or stockholder as its own investment no tax consequences to the insured arise, Lewis v. O'Malley, 8 Cir., 140 F.2d 735; Casale v. Commissioner, supra, but if it pays the premiums on the policy owned by the insured and of which he designates the beneficiary the amount paid in premiums constitutes taxable income to him. Yuengling v. Commissioner, 3 Cir., 69 F.2d 971; Commissioner of Internal Revenue v. Bonwit, 2 Cir., 87 F.2d 764; Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439.
 
 
 16
 The use of insurance policies to fund a stock retirement agreement creates an analogous but somewhat more complicated problem. See 71 Harv.L.R. 687. Such agreements are most commonly used in a closely held or family corporation, where the difficulty of accurately assessing and separating the economic benefits to be derived from the investment to the corporation and to the individual stockholders becomes almost insurmountable. Cf. Paramount-Richards Theatres, Inc., v. Commissioner, 5 Cir., 153 F.2d 602; Emeloid Co., Inc. v. Commissioner, 3 Cir., 189 F.2d 230; Prunier v. Commissioner, 1 Cir., 248 F. 2d 818. It is recognized that in every corporation the financial health of the organization and its continuance is of some concern and value to the stockholder and these values are further enhanced to the individual where a limited group controls the outstanding shares of stock. But the indefinable values achieved by the stockholder because of his relationship with other stockholders should not prevent the corporation from dealing with its assets to take advantage of investments for its future benefit. Nor should the stockholders be penalized by taxation upon income received and utilized in fact by the corporation. Lewis v. Commissioner, 1 Cir., 176 F.2d 646.
 
 
 17
 Because of the interlocking benefits contemplated by such an agreement between a corporation and its stockholders the test of weighing the ultimate purposes to be served and the potential benefits, as has been done by some courts and as was done by the trial court in this case, is impractical. Prunier v. Commissioner, supra; Lewis v. Commissioner, supra. As was said in Lewis v. O'Malley, supra, "In income taxation, no matter what form transactions may take, the inquiry must always go to the fundamental, whether the taxpayer really had income * * *". [140 F.2d 740.]
 
 
 18
 The present agreement does not partake of the taint of a transaction where corporate funds are used by the taxpayers to increase the value of their estates by payment of premiums on life insurance. The taxpayers here designated their beneficiaries but the proceeds of the policy were made subject to the agreement. They must be applied to perform the corporation's promise to retire the stock of the deceased stockholder. Had the bargain set the price of the stock at the face value of the policy only, the premium payments would represent no income to the insured and would effect the same result as though the corporation had been named as beneficiary and a separate contract had provided for sale of the stock at an agreed price. The initial execution of the contract would provide no taxable incident.
 
 
 19
 Because of the dual payment provisions for the stock in the agreement, the ultimate sale price of the stock to the corporation may be much higher than its actual value. It is conceivable that upon the insured's death, the stock of the corporation might be practically worthless and be exchanged for an amount having no relation to its value — the entire proceeds of the policy. On the other hand, if the stock maintains a high valuation, the exchange of stock for the proceeds of the policy and additional corporate money may result in a mere liquidation of capital. At any rate, because of the artificial minimum price set by the agreement, the stockholder will never suffer a loss by reason of the sale of stock — the sale price is assured to the amount of the face value of the policy.
 
 
 20
 It is conceded that the retirement of the stock could be accomplished by means of setting up a reserve account which would, of course, be an asset of the corporation in the same manner as the premiums here paid. Although at first blush it might appear that a promise by a corporation to retire its stock at a guaranteed minimum price would not be wise business management, such a guarantee might well be its only means of obtaining an agreement to sell. The simple execution of such a contract would give rise to no taxable event as to either the corporation or the stockholder. In the present case, the buy-sell agreement of the corporation and its stockholders is merely complicated by the use of insurance to fund the agreement. It is true that because the stockholder is guaranteed a minimum sales price for the stock, the stockholder may ultimately benefit considerably from the policy and agreement, but the amount of gain, if any, can only be evaluated at that time. During the contemplated life of the policy, the only realizable value, the benefits accruing to the owner of the policy, is with the corporation.
 
 
 21
 Further, if the premiums were to be regarded as providing income to the stockholder, the sale of his capital assets (which is the proposed result of this transaction) would be taxed over the period of his life as ordinary income before the gain is realized, without the more favorable basis of tax computation available to him upon a capital gain and contrary to the purpose of the Sixteenth Amendment. Whether the taxpayer will profit monetarily from this method of providing for the sale of his capital must remain a matter of conjecture until the time of the termination of the corporaration's agreement with him. Similarly, whether the sale will in fact effect a dividend distribution must await the occurrence of his death.
 
 
 22
 One other feature of the agreement which might allow the stockholder to acquire income is the provision to permit him to purchase the policy on his life from the corporation for the cash surrender value of the policy.[6] Although upon shareholder's withdrawal from the corporation the company may sell to him a policy of insurance at a price less than the premiums paid by the corporation, this is a matter for corporate decision and he can receive nothing as of right. If the corporation elects to retain the policy for its own investment, the stockholder receives no income from the payment of premiums. If the corporation elects to sell the policy for its then cash value the tax incidents of the sale will be determinable as of that time under the same principles applied to the question of whether the sale of any other corporate asset in fact amounts to a constructive dividend to the shareholder buyer.
 
 
 23
 The immediate present benefits to the stockholder arising from the execution of the agreement, such as the assurance of a market at a guaranteed minimum return on his stock, the appreciation of the value of his stock, and the retention of corporate officers acceptable to his limited group, are not taxable incidents. Whatever taxable benefits he may receive from this agreement and policy are contingent upon future happenings and incapable of present determination. The immediate benefits of the investment redound to the corporation. Under such circumstances it is not proper to impress premiums presently being paid with the label of constructive dividends. Upon the death or withdrawal of a stockholder, tax complications, including the possibility of an assessment of constructive dividends may arise, but the solution of these dimly-foreseen and nebulous problems must await a clearer view.
 
 
 24
 The case is reversed and remanded with directions to enter judgment for appellants.
 
 
 25
 MURRAH, Circuit Judge, would affirm the judgment of the United States District Court for the reasons stated in its opinion, 149 F.Supp. 942.
 
 
 
 Notes:
 
 
 [1]
 Hereinafter, the corporation
 
 
 [2]
 Policies on the lives of three of the stockholders read:
 "During the lifetime of the insured, the right to receive all cash values, loans and other benefits accruing hereunder, to exercise all options and privileges described herein, and to agree with the Company to any change in, amendment to, or cancellation of this policy shall vest alone in the life owner (hereinafter so called) designated as follows: Clover Club Foods Co., Kaysville, Utah, its successors or assigns."
 The policy on the fourth life was endorsed:
 "Pursuant to the written application for this policy, anything in this policy to the contrary notwithstanding, Clover Club Foods Co., a Utah corporation, its successors or assigns, is the owner of this policy and may, prior to the death of the Insured and without notice to or the consent of, and to the exclusion of the Insured and any beneficiary, receive, exercise and enjoy every benefit, option, right and privilege conferred by this policy or allowed by the Company, and neither the Insured nor his estate nor anyone claiming under or through the Insured shall have any interest, reversionary or otherwise, in this policy or in or to any of the proceeds, rights, benefits or privileges hereunder. Any benefits payable by reason of the death of the Insured shall be paid in accordance with the beneficiary designation of this policy."
 
 
 [3]
 "* * * Each of said policies shall name the Corporation as owner of all rights during the lifetime of the insured * * *"
 
 
 [4]
 "If, at the time any premium on such insurance policies becomes payable, the corporation has no current earnings, or surplus, available for payment of such premiums this agreement shall terminate, and the beneficiary of the said insurance policies shall be changed to the corpotion so that the corporation may hold said policies as ordinary assets to be retained or disposed of as the corporation may decide."
 
 
 [5]
 Internal Revenue Code 1939, Section 115, 26 U.S.C.A. § 115:
 "(a) Distribution by corporations. The term `dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * * without regard to the amount of the earnings and profits at the time the distribution was made. * * *
 "(b) Source of distributions. For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *"
 "(g) Redemption of stock. (1) In general. If a corporation cancels or redeems its stock * * * at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. * * *
 "(j) Valuation of dividend. If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder."
 
 
 [6]
 "* * * And the Corporation, at its option, may allow withdrawing Stockholder to purchase the policies of insurance on his life at a price equal to the then cash surrender value of said policies, or the Corporation may change the beneficiary of said policies to the Corporation and retain said policies with the Corporation as sole owner thereof free from the terms of this Agreement."