CLAUD E. LYNCH and MANITA H. LYNCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lynch v. Commissioner
Docket Nos. 4556-78, 19138-80.
United States Tax Court
T.C. Memo 1983-173; 1983 Tax Ct. Memo LEXIS 608; 45 T.C.M. (CCH) 1125; T.C.M. (RIA) 83173; March 31, 1983. *608 H entered into an arrangement with his closely held corporation, G, wherein he purchased property from G at a price which was less than its fair market value and borrowed money from a bank. H leased such property back to G and assigned the proceeds of the lease to the bank to repay the loan. G paid the premiums on H's personal life insurance policies which were also used to secure the loan. In addition, G paid for many of H's personal expenses. G later filed a voluntary petition in bankruptcy. Pursuant to the plan of arrangement, H sold his stock to C, and H was relieved of an undetermined amount of obligations. C renegotiated the lease and made payments thereon directly to the bank. C continued to operate the business, and H was employed as its manager. Held:
(1) H is not entitled to a deduction on the disposition of stock in G since he failed to prove that he sustained a loss on such disposition. (2) H realized a constructive dividend in 1971 by reason of his purchase of property from G at a price which was less than its fair market value.
(3) H realized constructive dividend income for determined amounts of corporate payments made on his behalf or for his benefit. (4) *609 H realized income from a trip awarded to him. (5) H may not deduct any additional amounts as business expenses since he failed to prove that his expenses were related to his business under sec. 162, I.R.C. 1954. Additionally, he failed to meet the requirements of sec. 274, I.R.C. 1954, with respect to his travel, entertainment, and meal expenditures. (6) H is entitled to deduct a determined amount as interest. (7) The issue of H's filing status for 1977 was raised untimely. (8) W is not entitled to relief in any year as an innocent spouse since she failed to prove that she did not know or have reason to know of the income omissions. Sec. 6013(e)(1)(B), I.R.C. 1954. Additionally, she failed to prove that it would be inequitable to hold her liable for the deficiencies. (9) H and W may utilize the provisions for averaging their income since they adequately proved their income for all the base period years. (10) H and W are liable for the addition to tax under sec. 6651(a), I.R.C. 1954, for failure to file timely their return for 1973. (11) H and W are liable for the addition to tax under sec. 6653(a), I.R.C. 1954, for negligence. Glenn A. Kirbo,Neal Weinberg, and William F. *610 Hammond, for the petitioners. Albert L. Sandlin, Jr., for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Sec. 6651(a)(1)
Sec. 6653(a)
Docket No.
Year
Deficiency
I.R.C. 1954 [1]
I.R.C. 1954
4556-78
1971
$269,330.64
$13,466.53
1972
19,893.04
994.65
1973
20,723.93
$1,856.04
1,425.24
19138-80
1975
4,308.00
215.00
1977
3,213.00
161.00
After concessions by both parties, the issues remaining for decision are: (1) Whether the petitioners are entitled to a deduction on the disposition of their shares in their closely held corporation; (2) whether the petitioners received a constructive dividend by reason of the purchase of property from such corporation for a price alleged to be less than its fair market value; (3) whether the petitioners received dividend income from certain corporate payments made on their behalf; (4) whether a trip awarded to the petitioners resulted in income taxable to them; (5) whether the petitioners may deduct certain amounts as business expenses; (6) whether the petitioners are entitled to interest deductions in excess of the amount *611 allowed by the Commissioner; (7) whether the petitioners intended to file a joint return for 1977; (8) whether Mrs. Lynch qualifies as an innocent spouse; (9) whether the petitioners may utilize the provisions for income averaging; (10) whether the petitioners are liable for the addition to tax under section 6651(a), relating to late filing; and (11) whether the petitioners are liable for the addition to tax under section 6653(a), relating to negligence. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Claud E. and Manita H. Lynch, husband and wife, were legal residents of Albany, Ga., at the time they filed their petitions in this case. They filed their joint Federal income tax returns for 1971, 1972, 1973, and 1975 with the Internal Revenue Service. A return was filed for 1977 containing the name of Mr. Lynch and labeled "Married filing separately." In 1964 Mr. Lynch and Jack D. Barrett formed a corporation under the laws of the State of Georgia known as Gibson Products Co. of Albany, Inc. (Gibson). Mr. Lynch purchased *612 500 shares (49 percent) for $50,000, and Mr. Barrett purchased 520 shares (51 percent) for $52,000. Gibson operated a discount department store known as Gibson's Discount Center. [2] Gibson was a franchisee of Gibson's Discount Centers, Inc. (Center). Gibson sold a complete line of hard and soft goods, major appliances, drugs, and sporting goods. Mr. Lynch was the president of Gibson and managed its daily store operation. Mr. Barrett, who was retired, served as an advisor and handled the bookkeeping from his home in Texas. Mr. Barrett also owned the Barrett Grocery Company, Inc. (Grocery). Grocery owned the Gibson store building and the land upon which the building was located. This property will be referred to as the Gibson property. By oral arrangement, Grocery rented the Gibson property to Gibson for a rental equal to 2 percent of its annual gross sales. Mr. Barrett died in 1968. Thereafter, Gibson continued to pay rent to Grocery under the same arrangement that existed prior to his death. In June 1969, Gibson borrowed $1 million from the Citizens and Southern National Bank of Albany *613 (C & S). Such loan was secured by Gibson stock, by a guaranty by Mr. Lynch, and by a $250,000 term insurance policy on the life of Mr. Lynch. The proceeds of such loan were used in part to purchase Mr. Barrett's stock from his estate for $600,000. The C & S loan carried an interest rate of 11 percent and provided for the repayment of principal as follows: Date
Amount
12/29/69
$100,000
12/29/70
200,000
12/29/71
200,000
12/29/72
200,000
12/29/73
200,000
7/1/74
100,000
In 1969, Gibson also purchased the Gibson property from Grocery for $600,000. Mr. Lynch personally borrowed $100,000 from his attorney, James Smith, to aid in the financing of such purchase. Grocery accepted a 1-year promissory note for $500,000 secured by the Gibson property. Successive secured notes were executed by Gibson with respect to such liability as follows: Date of Execution
Terms
Principal
July 1970
6 month, 11%
$500,000
Jan. 1971
6 month, 9-1/2%
400,000
June 1971
6 month, 9-1/2%
400,000
In early 1970, John R. Donovan, Sr., the comptroller of Gibson, discovered that certain corporate liabilities had not been properly recorded on its books. Under his direction, a schedule of such unrecorded liabilities was prepared, and such liabilities *614 totaled $296,813.41. Later, in 1970, C & S learned about the unrecorded liabilities of Gibson and called or threatened to call its loan to Gibson. For a time, Gibson paid C & S between $5,000 and $10,000 per week on the loan. However, the required payments to C & S, the need to pay off the unrecorded liabilities, and the need to pay off the obligation to Grocery for the purchase of the Gibson property, all combined to create a cash-flow problem. Mr. Lynch attempted to secure additional financing for the corporation, but his efforts were unsuccessful. In time, Mr. Lynch learned that he could secure a loan on the Gibson property if he became the owner of it. Sometime before January 6, 1971, he retained Frank H. Hedrick to perform an appraisal of the Gibson property for the purpose of securing a mortgage. At such time, Mr. Hedrick valued the Gibson property at $1.2 million--allocating $315,000 to the land and $885,000 to the improvements. On November 23, 1971, Mr. Lynch executed an agreement appointing Investment Mortgage Company (IMC) as his exclusive agent to obtain a loan in the amount of $800,000 for the purpose of purchasing the Gibson property. At such time, Harold Woods *615 III, an officer of IMC, valued the Gibson property at $1,140,000 and recommended that Cousins Mortgage and Equity Investments (Cousins) [3] approve a loan in the amount of $800,000 for 16 years at an interest rate of 10 percent. By warranty deed dated December 23, 1971, Gibson conveyed the Gibson property to Mr. Lynch, and such deed was recorded on that date. On January 6, 1972, there was a closing on the loan by Cousins. At such closing, Cousins loaned Mr. Lynch $800,000 for 16 years at an annual interest rate of 10 percent. Mr. Lynch executed a lease with Gibson wherein he (as landlord) leased the Gibson property to Gibson for a 16-year period at an annual rental of $120,000, and he assigned the proceeds of such lease to Cousins to be applied in discharge of the Cousins' loan to him. Additionally, Mr. Lynch executed a security deed on the Gibson property and assigned insurance policies on his life to Cousins. Gibson paid the premiums on such policies. Of the $800,000 borrowed by Mr. Lynch, $600,000 was applied to his purchase of the Gibson property and $200,000 was applied to reduce his personal debt to the corporation. *616 The loan closing statement indicated that the corporation was to pay $400,000.00 to Grocery and $431,187.13 to C & S. The deficiency in financing, amounting to $41,610.52, was to be paid by Mr. Lynch. The Gibson building was constructed in 1965 and 1966. Such building contained 75,600 square feet, consisted of concrete block with a brick front, and had a built-up roof supported by pipe columns and steel trusses. The floor was concrete and covered with asphalt tile. Partitions consisting of sheetrock panels were located throughout the building interior, and the ceiling consisted of acoustical tile. The entire structure had a sprinkler system. The building had air conditioning and heating systems. Other improvements on the Gibson property at the time of sale to Mr. Lynch included a loading platform, a storage area, an auxiliary building, a canopy, and fencing. The Gibson property was located on the southeast corner of Gordon Avenue and South Slappey Drive in Albany, Ga. The 6.3-acre tract was irreglar in shape and had approximately 293 feet of frontage on South Slappey Drive, which was a major north-south thoroughfare. The property had 715 feet of frontage on Gordon Avenue, *617 which served as an artery into the southwest residential section of Albany. The property was generally level, contained 4 acres of parking, and had a gentle slope to allow for water drainage. Access to the property was provided by entrances on both Gordon Avenue and South Slappey Drive. Gibson was located approximately 1 mile southwest of the Albany central business district, where Sears, Belks, and Rosenbergs department stores were located. J. C. Penneys, Woolworths, and Grants were located in the Mid-Town Shopping Center (Mid-Town), which was located about 1/2 mile north of Gibson, at the intersection of North Slappey Drive and Oglethorpe Avenue. Millers Discount Center was located immediately adjacent to Mid-Town. Two other stores, Kroger Family Center and Grant City, were located 1-1/2 miles north of Gibson on North Slappey Drive. In 1971, Gibson had little, if any, competition in its type of merchandising from any stores south of Oglethorpe Avenue. Albany is located in southwest Georgia and is the trade and distribution center for the area. Between 1950 and 1960, Albany experienced a 79.6-percent growth in its population, and between 1960 and 1970, the population increased *618 another 29.9 percent.After Mr. Lynch purchased the Gibson property, he purchased additional frontage and made other physical improvements to the store. In November 1972, Mr. Lynch requested and received approval from Cousins to secure a second mortgage. In April 1973, Mr. Hedrick issued a second appraisal on the Gibson property. At such time, he valued the property at $1,350,000, allocating $393,750 to the land and $956,250 to the improvements. In May 1974, Mr. Lynch applied for a $250,000 secondary mortgage loan with First South Homeowners Co., Inc., to be used "To repay existing debt for expansion of existing buildings and purchase of an additional tract of land." At the time of such application, Mr. Woods valued the Gibson property at $1,400,000. Such loan was granted in September 1974 at an interest rate of 16 percent for a 15-year term. The loan was secured by the Gibson property as well as by a secondary assignment of the lease. Gibson continued to experience financial difficulties, and in late 1974 or early 1975, Mr. Lynch and Herbert Gibson, the president of Center, discussed such financial difficulties and the possibility of Center purchasing Mr. Lynch's stock in Gibson. *619 Mr. Gibson suggested that Mr. Lynch file a petition for Gibson under Chapter XI of the Bankruptcy Act. Thereafter, on March 24, 1975, such a petition was filed. On April 29, 1975, Gibson filed its plan of arrangement, which provided, in part, that Mr. Lynch was to transfer his Gibson stock to Center, that Center was to provide the funding for payments to creditors, that the petitioners would not share in any distribution under the plan, and that all trade creditors holding the personal guaranty or endorsement of Mr. or Mrs. Lynch would agree to accept the payments under the plan in complete settlement of all liabilities of Mr. or Mrs. Lynch to them. Such plan was confirmed in June 1975. By letter dated March 21, 1975, Mr. Hedrick informed Tharpe & Brooks, Inc., that he valued the Gibson property at $1,350,000: I am of the opinion that S. Slappey Drive continues to be a desirable location for a Discount Center such as Gibson's. There is increasing activity in the area, McDonalds Hamburgers has just purchased a site on S. Slappey Dr. Contracts have been let for the fourth Flint River Bridge and the southern by-pass rights of way have been secured by the state highway department. *620 This by-pass will cross S. Slappey Drive approximately 3/4 mile south of Gibsons. Thereafter, in May 1975, Tharpe & Brooks, Inc., purchased the first mortgage on the Gibson property from Cousins for $630,000 and received an assignment of the lease from Cousins. The First South Homeowners (second) mortgage was transferred to the First National Bank of Atlanta (FNB). Both Tharpe & Brooks and FNB were subsidiaries of First Atlanta Corporation (First Atlanta). In 1975, Center took over the Gibson store, but Mr. Lynch retained his employment. In addition, Center guaranteed the payment of the rent; but the terms of the lease were renegotiated, and the rent was reduced to $7,500 per month. Thereafter, Center made regular monthly payments on the lease directly to FNB.
During 1968 through 1974, Gibson reported the following amounts on its corporate returns: Loans to
Loans from
Shareholder
Year
Shareholders
Shareholders
Capital Account
1968
[4] *621 $102,000.00
1969
$6,000.00
102,000.00
1970
100,000.00
102,000.00
1971
100,000.00
102,000.00
1972
52,979.58
102,000.00
1973
149,359.87
102,000.00
1974
127,421.98
102,000.00
During 1971 through 1973, Gibson paid for flight lessons for the petitioners' son, Eddie. Eddie worked in the Gibson sporting goods department. Gibson employed two regular pilots during such years. Gibson also made payments to James C. Wigzell, a tax accountant, of $592 in 1971 and $560 in 1972 for the preparation of the petitioners' tax returns. Gibson also paid $400 in 1971 and $3,000 in 1972 for certain legal expenses of the petitioners. The $3,000 fee in 1972 was paid for services relating to the Cousins' loan. Gibson also paid the petitioner's membership fees in the Southwest Georgia Sportsmans Club, the YMCA, and the Elks Lodge. In 1973, Gibson paid to replace the flashing around the Gibson building. Mr. Lynch was liable for all exterior repairs under the lease. In that year, Gibson also purchased an ice machine for use in the business. In 1973, the petitioners took a trip to Japan which was sponsored and paid for by Gibson Refrigerator Co. (Refrigerator), Sylvania, and W. D. Alexander Company. Such trip was awarded to Gibson based on its sales volume. While in Japan, Mr. *622 Lynch saw new merchandise and received an award. He went on such trip because his wife wanted to do so. He did not keep a diary or other contemporaneous record of his expenditures. Gibson paid certain expenses of the petitioners on such trip which were not paid by the sponsors. On October 18, 1978, Burl E. Turner of FNB wrote a letter to Mr. Lynch informing him that he "paid" interest totaling $30,000.00 in 1975 and $40,997.95 in 1977; however, a loan reduction schedule with respect to the Cousins loan indicates interest for such years in the amounts of $42,254.54 for 1975 and $68,999.91 for 1977. During 1971 through 1973, Mrs. Lynch was the corporate treasurer for Gibson. She also worked at the store where she signed payroll checks, went on buying trips for ladies' clothing, checked for shoplifters, took inventory, and ran errands. At times, she had the use of a company car. She was paid an annual salary of $8,400. During 1971, she knew that Mr. Lynch was trying to get a loan, and although she did not know the details of the Cousins loan, she was made aware that Mr. Lynch owned the land and building for the Gibson store. Mrs. Lynch never kept the books and records for Gibson; *623 nor did she keep the books and records for the properties owned by the petitioners, except that in 1976, she did commence to keep such records for two of their rental properties. The petitioners filed joint Federal income tax returns for 1967, 1969, and 1970, showing taxable income in the following amounts: 1967
$12,485.52
1969
17,137.40
1970
33,025.10
In 1968, Mr. Lynch received compensation from Gibson in the amount of $34,166.72. On their return for 1971, the petitioners failed to report as income numerous payments made by Gibson on their behalf. In addition, they failed to report any income arising out of their purchase of the Gibson property. They claimed a long-term capital loss on their shares in Safe-Air Corp. (Safe-Air). Safe-Air became bankrupt in 1971. On their return for 1972, the petitioners claimed the same long-term capital loss relating to their Safe-Air stock. In addition, they omitted a long-term capital gain of $1,850 on the sale of C & S stock, and they failed to report as income the payments made by Gibson on their behalf. On their return for 1973, the petitioners failed to report as income the payments made by Gibson on their behalf. In addition, they failed *624 to report a long-term capital gain on the sale of property and claimed a partnership loss in excess of the amount to which they were entitled. The petitioners secured three extensions of time for filing their return for 1973, thus extending such time until September 30, 1974, but they did not in fact file such return until November 18, 1974. On their return for 1975, the petitioners underreported their rental income from the Gibson property. In addition, they failed to report as income a number of ordinary and capital gains. For 1977, a return was filed containing Mr. Lynch's name and indicating a filing status of "Married filing separately." On such return, he failed to report any rental income on the Gibson property.After they had filed their petition in this case, the petitioners lodged an amended return for 1977 with the IRS. Such return was signed by both Mr. and Mrs. Lynch and indicated that Mr. Lynch was filing as "Married filing separately." In his notices of deficiency, the Commissioner determined that the petitioners received a constructive dividend in 1971 of $550,000 by reason of their purchase of the Gibson property at a price which was less than its fair market value *625 ($1,150,000). Of such amount, he determined that $305,292 represented the value of the land and $844,708 represented the value of the building. He further determined that the petitioners were entitled to claim depreciation on such building using a 25-year life beginning in 1972. He also determined that the petitioners received income by reason of numerous payments which were made by Gibson on their behalf or for their benefit, including, in part, life insurance premiums of $21,386.31 in 1972 and $27,258.34 in 1973; flight lessons of $428.99 in 1971, $251.17 in 1972, and $366.89 in 1973; membership fees of $280.00 in 1971, $50.00 in 1972, and $270.00 in 1973; an expenditure for flashing of $2,044.00 in 1973; the purchase of an ice machine for $2,500.00 in 1973; accounting fees of $592.00 in 1971 nd $560.00 in 1972; and legal fees of $400.00 in 1971 and $3,000.00 in 1972. The Commissioner determined that the legal fee for 1972 related to the Cousins loan and allowed the petitioners to amortize such amount over a 16-year term. He further determined that the flashing expenditure was depreciable over a 10-year term. The Commissioner further determined that the petitioners had received *626 income to the extent of the fair market value of a trip awarded to them in 1973 and that they received additional income of $575.19 by reason of Gibson's payment of other expenses relating to such trip. In addition, the Commissioner determined that the petitioners received rental income of $80,004 in 1975 and $90,000 in 1977 and allowed them deductions for interest in the amounts of $30,000 in 1975 and $40,998 in 1977. He computed the petitioners' tax liability for 1977 based on the rates for married persons filing jointly and determined that the petitioners were not allowed to claim $25,744.00 in 1977 as an ordinary loss from the disposition of rental property. At trial, the parties stipulated that such loss should be allowed as a net operating loss in 1976. The Commissioner further determined that the petitioners were liable for an addition to tax under section 6651(a)(1) for filing untimely their return for 1973 and that they were liable for additions to tax for each year under section 6653(a) for negligence. Finally, he takes the position that the petitioners are not entitled to average their income and that Mrs. Lynch did not qualify as an innocent spouse. OPINION Issue 1. *627 Stock Loss
After trial, the petitioners were allowed to amend their petitions to conform to the proof, and in such amended petitions, they maintained that their stock constituted section 1244 stock, that their initial capital contribution was $48,000, and that they made two additional contributions to Gibson in the amounts of $100,000 and $189,000. Therefore, they claimed that they suffered a loss of $337,000 on the transfer of their stock to Center. On brief, they abandoned the section 1244 argument and admitted that their initial investment in Gibson was for investment purposes. However, they now contend that they made three additional advances to Gibson ($100,000 in 1969, $41,611 in 1972, and $189,604 in 1974). They maintain that such advances were made with "business" motives and argue that the losses stemming from such additional advances should be considered as business bad debts, contributions to capital, or business expenses. In opposition, the Commissioner argues that such claims constitute new matter which should not be considered by this Court. Alternatively, he argues, in part, that the petitioners failed to prove that they made any subsequent advances to Gibson which *628 would constitute loans, contributions to capital, or business expenses. We are satisfied that the Commissioner had adequate notice of the petitioners' claims and that therefore they do not represent impermissible new matters. The petitioners have the burden of proving the existence and nature of their claimed advances to Gibson. Rule 142(a), Tax Court Rules of Practice and Procedure[5]; Welch v. Helvering,290 U.S. 111 (1933). To carry such burden, the petitioners argue that in 1969 they "borrowed" $100,000.00 from Mr. Smith and advanced such sum to Gibson to facilitate the purchase of the building and stock from the Barrett estate. As evidence of such indebtedness, they point to a 1975 security deed in the amount of $78,593.97 giving Mr. Smith secondary security interests in three parcels of real estate. Yet, the petitioners introduced no persuasive evidence that Gibson ever treated the $100,000.00 advanced by them either as a loan or a capital contribution. The fact that Mr. Lynch may have transferred $100,000.00 to Gibson cannot, of itself, lead us to conclude that he made a loan or capital contribution *629 in such amount; if the transfer took place, it may have been the repayment of a loan made by Gibson to the petitioners. Gibson's balance sheet, as reflected on its corporate income tax return for 1969, shows a small loan to shareholders, no loans from shareholders, and no increase in the capital account. Total stockholders' capital amounted to $102,000.00, which consisted of Mr. Barrett's investment of $52,000.00 and Mr. Lynch's investment of $50,000.00. Gibson's books and records should have shown the existence of loans or additional capital contributions; yet, they were not introduced. Thus, we cannot find that such contribution was made. The petitioners alleged that they next made an additional capital contribution of $41,611.00 in 1972 and that such amount was furnished by them to cover the deficit in the funds needed to meet the obligations after receiving the Cousins loan.They point to the loan closing statement indicating that Mr. Lynch was to furnish such amount. Just as with their first claim, we cannot conclude that such amount, if in fact furnished by the petitioners, constituted either a loan or a capital contribution. No documentary evidence reflecting such a payment *630 by Mr. Lynch was introduced; the corporate return fails to reflect any loans outstanding from shareholders, and there was no change in the shareholders' capital account. On the other hand, loans to shareholders fluctuated greatly, and it may very well be that such amount, if in fact furnished by Mr. Lynch, was used to reduce the balance of a loan that he had received from Gibson. The certified audit report indicated that as of December 31, 1971, the petitioner owed Gibson $234,943.83 and that he had reduced such amount by $200,000.00 on January 6, 1972. On this record, we cannot sustain the petitioners' claim. The petitioners claim that in 1974 they contributed the proceeds of the First South Homeowners loan ($189,604) to Gibson to provide working capital.Yet, the application for such loan indicated that such proceeds were to be used to purchase additional land and to repay debt on the expansion of existing buildings. We cannot discern from this record whether such amount was applied, as the petitioners allege, for corporate purposes. If anything, the record indicates that Mr. Lynch owned the buildings in question and that such funds were applied for his benefit as the owner *631 of such buildings. There is no persuasive evidence showing that any such amount was treated by Gibson as a contribution to capital or as a corporate debt. Similarly, the petitioners' claimed advances are not deductible by them as business expenses. For an expense to qualify under section 162, it must be ordinary and necessary and must be paid or incurred during the taxable year for carrying on the trade or business of the taxpayer. See Commissioner v. Lincoln Savings & Loan Assn.,403 U.S. 345, 352 (1971); Kornhauser v. United States,276 U.S. 145 (1928); Iowa-Des Moines Nat. Bank v. Commissioner,592 F. 2d 433, 435-436 (8th Cir. 1979), affg. 68 T.C. 872 (1977). Advances cannot be treated as expenses if they are made with the expectation of repayment. Estate of Byers v. Commissioner,472 F. 2d 590, 592 (6th Cir. 1973), affg. 57 T.C. 568 (1972); Horne v. Commissioner,59 T.C. 319, 336 (1972), affd. 523 F. 2d 1363 (9th Cir. 1975). For a host of reasons, such claimed advances cannot qualify for deductions as business expenses.First, and most importantly, the petitioners have failed to prove that they in fact paid such amounts during the years in question. Second, even if the petitioners *632 did make such payments to Gibson, they wholly failed to show that such payments were applied for the purposes claimed, or that such payments were made by the petitioners in connection with their own trade or business as opposed to that of Gibson. Deputy v. Dupont,308 U.S. 488 (1940); Benak v. Commissioner,77 T.C. 1213 (1981); Ostrom v. Commissioner,77 T.C. 608 (1981); Rand v. Commissioner,35 T.C. 956, 960 (1961). In short, the petitioners have wholly failed to prove that they made any additional advances to Gibson that qualified as loans, contributions to capital, or business expenses. The petitioners next argue that they sustained a total loss on the disposition of the Gibson shares in 1975. They maintain that the Gibson stock became worthless and that such shares were "sold" for no consideration to Center.Therefore, they argue that they are entitled to a capital loss in the amount of their investment in Gibson. The Commissioner maintains that Mr. Lynch received other valuable consideration for his stock and that the petitioners did not prove that such stock became worthless in 1975. The petitioners have the burden of proving that they sustained a loss on the disposition of *633 the Gibson shares and the amount of such loss. Rule 142(a); Welch v. Helvering, supra.
The circumstances relating to the disposition of the Gibson stock are unclear. The Chapter XI petition stated that Gibson was unable to pay its debts as they matured. Yet, the fact that Gibson may have been suffering from a lack of working capital does not prove that the underlying stock was worthless. Gibson's books and records were not introduced into evidence. Also, prior to the filing of the Chapter XI plan of arrangement, Mr. Gibson, the president of Center, had discussed with Mr. Lynch the possibility of purchasing Mr. Lynch's shares and running the business. The fact that Center was willing to purchase such shares, take over the business, and guarantee the payments on the lease suggest that the business had some value. Furthermore, Mr. Lynch remained in his position as the store manager and was relieved of his obligations as a guarantor of corporate indebtedness. Under these circumstances, we cannot conclude that he received "no" consideration for his shares. Since the petitioners have not provided us with information sufficient to determine the amount of such consideration, we cannot *634 determine the amount realized. Accordingly, we hold that the petitioners have failed to carry their burden of proving that they sustained any loss on the disposition of their shares. Issue 2. Constructive Dividend - Property
The next issue for decision is whether the sale of the Gibson property to Mr. Lynch in 1971 resulted in a constructive dividend to him. If property is sold by a corporation to a shareholder for an amount which is less than its fair market value, the transaction may be regarded as a bargain purchase with the "bargain" element being taxed to the shareholder as a dividend. Green v. United States,460 F. 2d 412 (5th Cir. 1972); Riss v. Commissioner,56 T.C. 388, 429 (1971), supp. opinion 57 T.C. 469 (1971), affd. on this issue 478 F. 2d 1160 (8th Cir. 1973); Dellinger v. Commissioner,32 T.C. 1178 (1959); see also Richardson v. United States,330 F. Supp. 102 (S.D. Tex. 1971). On the other hand, where the amount paid by a shareholder is equal to the fair market value of the property, the sale cannot be regarded as a bargain purchase since the net worth of the corporation is not diminished by such a transaction. See Southern Ford Tractor Corp. v. Commissioner,29 T.C. 833, 841-842 (1958). *635 In determining the existence of a dividend, the courts have looked to the economic effect of the transactions; the intent of the parties is not dispositive in characterizing a distribution as a dividend. See Baumer v. United States,580 F. 2d 863, 876 (5th Cir. 1978). The crucial concept in finding a constructive dividend is that the corporation conferred an economic benefit on the stockholder without the expectation of repayment. Gibbs v. Tomlinson,362 F. 2d 394, 397 (5th Cir. 1966); see also United States v. Smith,418 F. 2d 589, 593 (5th Cir. 1969).
The determination of the fair market value of property at a given date is a question of fact. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). The term fair market value has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both being reasonably informed as to all relevant facts. See Alvary v. United States,302 F. 2d 790, 794 (2d Cir. 1962); Epstein v. Commissioner,53 T.C. 459, 472 (1969); Newberry v. Commissioner,39 B.T.A. 1123, 1128-1129 (1939). The petitioners have the burden of proving that the *636 Commissioner's determination of value was erroneous. Rule 142(a); Brittingham v. Commissioner,66 T.C. 373, 410 (1976), affd. per curiam 598 F. 2d 1375 (5th Cir. 1979). The parties have presented various forms of evidence and testimony, including that of expert witnesses, in order to substantiate the values alleged by them. The petitioners' valuation of the property was based primarily on the testimony and opinion of H. Douglas Everett. Mr. Everett is a member of the Appraisal Institute of the American Institute of Real Estate Appraisers (MAI designation) and is a member of the Society of Real Estate Appraisers (SRA designation). He has been appraising real estate since 1967 and received his MAI designation in 1980. In determining the fair market value of the Gibson property, Mr. Everett used both a modified cost approach and an income approach. Under the modified cost approach, Mr. Everett took the original construction costs and adjusted them upward through information obtained from Marshall-Swift, a nationally known cost service. He then added an additional 15 percent for expenses and estimated that in 1971 the cost of constructing the improvements on the Gibson property would *637 be $573,886. To this figure, he added a land value of $157,500 ($25,000 per acre) and concluded that the Gibson property was worth $731,386. Under the income approach, Mr. Everett first determined to use an overall capitalization rate that reflected an appropriate return on the mortgage and the equity interests in the property, and he concluded that the proper capitalization rate to use was.104228.He then determined the economic rent to be charged for the Gibson building. He considered the rent paid by such other department stores as W. T. Grant ($1.37), Millers ($1.35), Penneys ($1.15), and Woolworths ($1.10) and concluded that Millers and Grants were the most comparable to Gibsons; yet, he decided to use a rent of $1.20 per square foot for the Gibson building. He calculated net income after expenses to be $74,220 ($1.20 psf X 75,600 - expenses of $16,500) and concluded that the value of the property was $712,093 ($74,220 /.104228). Mr. Everett was of the opinion that the use of the income approach produced the most reliable valuation of the property. The petitioners also rely on the testimony of Dan Wilmoth. Mr. Wilmoth constructed the Gibson building in two stages in the *638 mid-1960s and stated that the total cost of such construction was $321,977 ($4 per square foot). He then estimated that it would cost $4.54 per square foot to construct a similar structure in 1971. He admitted that such costs were unusually low but explained that they were attributable to the utilitarian nature of the Gibson structures, describing them as "air conditioned boxes." The Commissioner's valuation of the Gibson property was based upon an appraisal performed by Diane Brown. At the time of such appraisal, Mrs. Brown had completed two real estate appraisal courses with the American Institute of Real Estate Appraisers (Basic Principles, Methods, and Techniques and Capitalization Theory and Techniques). In addition, she had completed one year of college and had worked as an appraiser for the IRS since 1973. To determine the value of the land, Mrs. Brown first utilized a market data appraoch. She compared the sales of other parcels and made adjustments for differences between the comparable properties and the Gibson property to determine the probable sales price for the Gibson property on the valuation date. After such analysis, Mrs. Brown concluded that on December 23, *639 1971, the Gibson land was worth $50,000 an acre, or $315,000. To determine the value of the improvements, Mrs. Brown first utilized an income approach.She prepared the following list of comparable rentals: Rent Per Square Foot
Property
$1.37
W. T. Grant
1.90
Roses Dept. Store
1.25
Miles Furniture Store (1967 lease)
2.00
Miles Furniture Store (1974 lease)
1.28
Shoe World
1.28
Piggly Wiggly
1.75
Food Fair
2.50
Kroger
1.43
Cloth World
1.15
J. C. Penney
She considered W. T. Grant to be the most comparable in size and use to the Gibson building. After taking into consideration that the Grant building and location were superior, Mrs. Brown concluded that the fair rental value for the Gibson building should be between $1.42 and $1.45 per square foot. Accordingly, she concluded that the annual gross income imputable to the property was $109,620 (75,600 square feet X $1.45) and that net income after expenses was $94,035. She next analyzed market conditions in 1971 and deducted the amount of income imputable to the land ($25,200) to find the amount of income imputable to improvements, $68,835. The value of such improvements was then determined to be $655,000 based upon a capitalization rate of 10.5 percent (8.0) *640 percent return on investment + 2-1/2 percent depreciation recapture rate). Thus, Mrs. Brown's appraisal reflected a total valuation for the Gibson property under the income approach of $970,000 ($315,000 land + $655,000 building). In her appraisal report, Mrs. Brown also considered a cost approach. Therein, she utilized the Marshall-Swift cost evaluation service to estimate the cost of replacing each improvement in 1971. Under such approach, she concluded that the total value of the Gibson property (land and building) was $955,527. However, in her report, she gave little weight to the use of the cost approach and chose to rely on her determination under the income approach. The Commissioner also relies on the testimony and appraisal reports of Frank H. Hedrick to substantiate his determination of value. At the time of his first appraisal of the Gibson property (1971), Mr. Hedrick had 24 years of experience in the real estate business and 22 years of appraisal experience. He held the designatation of Senior Residential Appraiser (SRA) in the Society of Real Estate Appraisers, as well as the designation of Certified Real Estate Appraiser (CREA) in the National Association of Real *641 Estate Appraisers. In the course of his employment, Mr. Hedrick had worked as a fee appraiser for the Veteran's Administration and the Federal Housing Administration and as an approved appraiser for the General Services Administration, U.S. Corps of Engineers, and the Urban Renewal Program. In addition, he was a member of the Society of Real Estate Appraisers, the National Association of Real Estate Appraisers, the National Association of Real Estate Boards, the Georgia Association of Real Estate Boards, and the Albany Real Estate Board. He also had qualified to testify as an expert on real estate before both the State and Federal courts. In his first appraisal report in 1971, Mr. Hedrick considered and analyzed other sales of property on South Slappey Drive. After taking into consideration the time of sale, size, and utility of the Gibson parcel, he concluded that the land was worth $50,000 per acre, or $315,000 for the total parcel. In determining the value of the improvements, Mr. Hedrick first utilized the cost approach. In such evaluation, he utilized the Marshall Evaluation Service. Utilizing such estimates, he computed that the value of the building after depreciation *642 was $884,506. He next utilized the income approach and determined that similar properties rented for $1.80 per square foot. In making such determination, he did not consider the rents of Millers, Grants, Woolworths, or Penneys. He further determined that investors expected an 8-percent return on land and a 10.5-percent return on improvements. Accordingly, he computed that the total value of the improvements was $886,667. Mr. Hedrick considered the income approach to be more reflective of fair market value than the cost approach, and he concluded that the value of the Gibson property on January 6, 1971, was $1,200,000. The Commissioner further relies on the testimony and report of Harold Woods III. Mr. Woods has appraised property since 1964, and he taught a residential appraisal course at Georgia State University. Mr. Woods utilized both the cost and income approaches in making his determination as to the fair market value of the Gibson property in 1971. After analyzing comparable sales of property, Mr. Woods valued the Gibson land at $27,500 an acre, or $173,250.Mr. Woods considered the improvements to be worth $966,750 and therefore concluded that the fair market value of *643 the Gibson property on December 6, 1971, was $1,140,000. The Commissioner further relies on the testimony of Robert V. MacKenzie, an IRS real estate appraiser. Mr. MacKenzie is a member of the American Society of Appraisers, has taken a number of courses in order to qualify for the MAI designation, and has been practicing as a real estate appraiser for 10 years. Mr. MacKenzie did not perform a full appraisal on the property, although he made a determination that the fair market value of the property on December 23, 1971, was $955,000.He analyzed comparable sales and concluded that the Gibson parcel was worth $32,000 an acre, or $220,000. Mr. MacKenzie next considered the rental costs at Millers and Grants to be the most comparable. However, he explained that both stores had overage clauses in their leases which would allow a lessor to share in a certain percentage of the lessee's gross sales. He also considered that Grants was an anchor tenant in a shopping center and explained that anchor tenants paid a good deal less rent than other tenants in a shopping center. After considering all of these factors, he concluded that $1.50 per square foot was the best measure of rent for *644 the Gibson building in 1971. Thereafter, he computed Gibson's net income after expenses to be $98,420 and capitalized such income at a 10.3 percent rate which he considered would provide a fair return on the mortgage and the equity interests in the property. As a result, he concluded that the fair market value of the Gibson property (land and building) was $955,000. In his computations, Mr. MacKenzie also consaidered a cost approach in which he concluded that the fair market value of the Gibson property was $885,000. He gave no breakdown on how he arrived at such figure and chose to rely on his computation under the income approach as the best indicator of fair market value. Mr. Everett, Mr. Wilmoth, Mr. Hedrick, Mrs. Brown, Mr. Woods, and Mr. MacKenzie were all qualified and experienced in their respective professions. Their testimony was credible; yet, they reached vastly different conclusions as to the fair market value of the Gibson property on December 23, 1971. In our opinion, the conclusions of Mrs. Brown, Mr. Hedrick, Mr. Woods, and Mr. MacKenzie were too high, and the conclusion of Mr. Everett too low. In our judgment, the income method provides the most reliable method *645 of valuing the Gibson property since it is a commercial property. See generally Honigman v. Commissioner,55 T.C. 1067, 1077-1078 (1971), affd. on this issue 466 F. 2d 69 (6th Cir. 1972); Zongker v. Commissioner,39 T.C. 1046 (1963), affd. per curiam 334 F. 2d 44 (10th Cir. 1964); Huron Building Co. v. Commissioner,15 B.T.A. 1107 (1929), affd. sub nom. Tracy v. Commissioner,53 F. 2d 575 (6th Cir. 1931); see also R. Cox, "Income Approach to Value," in Encyclopedia of Real Estate Appraising 39 (E. Friedman ed., 3d ed. 1978). The experts suggested different rental rates to be used in computing the income that could be derived from the Gibson property. Mrs. Brown originally thought that a rental of $1.75 per square foot should be applied, but later believed that $1.45 was proper. Mr. Hedrick used a figure of $1.80 per square foot, yet he failed to consider the rents at comparable department stores. Mr. Everett considered $1.20 to be a proper amount of rent, notwithstanding his opinion that Millers and Grants were the most comparable to Gibson.In our view, Mr. MacKenzie's analysis of the rent comparables is the most persuasive. He considered rents of similar stores and made appropriate *646 adjustments to reflect overage clauses and that Gibson was not an anchor tenant in a shopping center. Accordingly, we believe that the proper amount of rent was $1.50 per square foot. Mr. Everett and Mr. MacKenzie used a mortgage equity method in deriving an overall rate of capitalization, and we are persuaded that such method is appropriate in this case. E. Bowes and S. Guernsey, "Appraisal of Store Property," in Encyclopedia of Real Estate Appraising 421, 433 (E. Friedman ed., 3d ed. 1978). In that method, rates of return were analyzed and related to mortgage and venture capital money markets at the time of the valuation date. The employment of such an overall rate recognized that changes in the cost of money affect real property market values and that market value is a reflection of both the mortgage market and the attitude of equity investors at a particular point in time. Both Mr. Everett and Mr. MacKenzie recognized such factors in deriving their overall rates of capitalization, and such rates, as calculated, differed by only.001228. Accordingly, we conclude that a rate of.104 is proper. Using a rental rate of $1.50 per square foot, expenses of $16,000, and a capitalization *647 rate of.104, we find that the fair market value of the Gibson property on December 23, 1971, was $936,500. [6]
At trial, the petitioners attempted to discount the value of the Gibson property by asserting that there had been changes in the neighborhood. Such attempt has failed for a number of reasons: First, there is no evidence of a decline as of the valuation date. Any decline, if it occurred at all, occurred subsequent to such date. Second, even if the composition of the neighborhood changed, the effect of such change would be nebulous. As stated in American Institute of Real Estate Appraisers, The Appraisal of Real Estate 89 (7th ed. 1978): In neighborhood analysis the appraiser should avoid reliance on the racial, religious, or ethnic characteristics of the residents. Racial and other ethnic factors are not reliable *648 predictors of value trends, and the use of those factors by the appraiser in neighborhood analysis can be misleading. People's reactions and preferences are so diverse and variable that they are not readily quantifiable in the course of the appraisal process. The petitioners also vigorously argue that they should not be taxable on the distribution of the Gibson property. They maintain that such property was distributed to them for the purpose of obtaining financing. Thus, they contend that since such distribution was made for the benefit of the corporation, they did not receive a taxable dividend even if Mr. Lynch purchased the property for less than its fair market value. We find such argument to be unpersuasive. Section 1.301-1(j), Income Tax Regs., provides: (j) Transfers for less than fair market value. If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair *649 market value. * * * The fact that the sale to Mr. Lynch may have been motivated by Gibson's need for cash does not assist the petitioners' cause. While the need for cash may explain why Gibson transferred the property to Mr. Lynch, its sole shareholder, it does not justify the sale of property to him at a price which was much less than its fair market value. At the time of the purchase, Mr. Lynch was heavily indebted to the corporation; thereafter, he purchased the property from Gibson for $600,000 and paid to Gibson $200,000 in reduction of his indebtedness. After the air had cleared, Gibson had $800,000, but it was left without its major asset, for which it had received less than its value. Under such circumstances, we hold that, as a result of his purchase of the Gibson property, Mr. Lynch received in 1971 a constructive dividend of $336,500--the difference between the fair market value of the property ($936,500) and the $600,000 which he paid for such property. [7] See, e.g., Riss v. Commissioner,supra;Lacy v. Commissioner,341 F. 2d 54 (10th Cir. 1965), affg. 39 T.C. 1100, 1107 (1963); Security First Nat. Bank v. Commissioner,28 B.T.A. 289, 310-311 (1933); Castle v. Commissioner,9 B.T.A. 931 (1927). *650 Issue 3. Constructive Dividend - Corporate Payments In General
Expenditures by a corporation for the personal benefit of a shareholder may result in a constructive dividend to the shareholder. See Ireland v. United States,621 F. 2d 731 (5th Cir. 1980); Enoch v. Commissioner,57 T.C. 781 (1972); American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957), affd. per curiam 262 F. 2d 150 (9th Cir. 1958). In determining whether there has been a constructive dividend, "The crucial concept * * * is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." United States v. Smith,418 F. 2d 589, 593 (5th Cir. 1969). *651 The basic issue is whether the corporate expenditure was incurred primarily to benefit the corporation's trade or business or primarily for the personal benefit of the stockholders. Loftin and Woodard, Inc. v. United States,577 F. 2d 1206, 1215-1217 (5th Cir. 1978); United States v. Gotcher,401 F. 2d 118, 121 (5th Cir. 1968); see also Sachs v. Commissioner,277 F. 2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959); Larkin v. Commissioner,48 T.C. 629 (1967), affd. 394 F. 2d 494 (1st Cir. 1968). "Whether or not a corporate distribution is a dividend or something else, such as a gift, compensation for services, repayment of a loan, interest on a loan, or payment for property purchased, presents a question of fact to be determined in each case." Lengsfield v. Commissioner,241 F. 2d 508, 510 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. [8] *652 We will consider and address each corporate payment separately. Life Insurance
The next issue for decision is whether the payments by Gibson of premiums on the life of Mr. Lynch resulted in a constructive dividend to the petitioners. The petitioners *653 argue that the insurance on Mr. Lynch's life was arranged as a part of a financing package. They maintain that the form of such transaction was dictated by the lender (Cousins) and that Gibson's survival was the primary motive behind the payment of such premiums by Gibson. The Commissioner argues that the question of economic benefit is determinative. He maintains that Mr. Lynch enjoyed all of the incidents of ownership in such policies and that he reaped a substantial benefit by reason of Gibson's payment of the insurance premiums. Therefore, he concludes that the petitioners should be taxable on the amount of the premiums paid by Gibson. The petitioners have the burden of proving that the amount of such premiums did not constitute a constructive dividend to them.Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). The payment of premiums by a corporation on an insurance policy owned by a shareholder results in a constructive dividend to the shareholder. Paramount-Richards Theatres, Inc. v. Commissioner,153 F. 2d 602 (5th Cir. 1946), affg. a Memorandum Opinion of this Court; Canady v. Guitteau,86 F. 2d 303 (6th Cir. 1936); Yuengling v. Commissioner,69 F. 2d 971 (3d Cir. 1934), *654 affg. 27 B.T.A. 782 (1933); Adams v. Commissioner,18 B.T.A. 381 (1929).However, where the corporation is the owner of the policy, no dividend results from the payment of such premiums by the corporation. See Sanders v. Fox,253 F. 2d 855 (10th Cir. 1958); Lewis v. O'Malley,140 F. 2d 735 (8th Cir. 1944). The finding of a constructive dividend turns on whether a present economic benefit is conferred on the shareholder, and it is clear that such a present economic benefit was conferred on Mr. Lynch in the form of insurance protection. While it is true that the terms of the Cousins loan required that Mr. Lynch be insured, such terms did not require that Gibson pay the premiums on such policies. Yet, Gibson paid such premiums and Mr. Lynch utilized such insurance to secure the loan which he used to purchase the Gibson property. Such facts alone point to a substantial economic benefit being conferred on the petitioners. Furthermore, if Mr. Lynch had died, the proceeds of such policies would have been utilized to pay the balance of the outstanding loan with Cousins, and thereafter, the Lynch estate (not Gibson) would have owned the property free of such encumbrance. Thus, we conclude *655 that a substantial economic benefit was conferred on the petitioners, and accordingly, we hold that the amount of the premium payments made by Gibson constituted dividend income to the petitioners. Legal Fees
The next issue for decision is whether the petitioners realized income by reason of Gibson's payment of legal fees of $400 in 1971 and $3,000 in 1972. Generally, the payment of a shareholder's expenses by a corporation constitutes a constructive dividend to the shareholder. American Properties, Inc. v. Commissioner,28 T.C. at 1115; Greenspon v. Commissioner,23 T.C. 138, 150-152 (1954), affd. on this issue 229 F. 2d 947 (8th Cir. 1956). The determination of a constructive dividend turns on whether the payments are "primarily for shareholder benefit" or "primarily for corporate benefit." Loftin and Woodard, Inc. v. United States,577 F. 2d at 1215. The petitioners have the burden of providing that the payments did not constitute constructive dividends to them. Rule 142(a); Welch v. Helvering,supra.
The petitioners first argue that they are not taxable on the legal fees because they were incurred for the benefit of the corporation. The evidence does not support such a contention. *656 The 1971 payment was made for legal services of an undisclosed nature, and the 1972 payment was made in connection with the loan which enabled Mr. Lynch to purchase the Gibson property.Irrespective of the reasons for the sale of the property to Mr. Lynch, he did become the owner of it, and we cannot find that Gibson was the primary beneficiary of either of such expenditures. Accordingly, we hold that such payments by Gibson resulted in constructive dividends to the petitioners.
In the alternative, the petitioners argue that such fees should be deductible by them as expenses relating to rental property under section 212. For expenses to be deductible under section 212, they must be ordinary and necessary and paid during the taxable year either for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Sec. 212. This Court has held that expenditures incurred to procure a loan constitute capital expenditures which should be spread over the term of the loan. See Austin Co. v. Commissioner,71 T.C. 955 (1979); Enoch v. Commissioner,57 T.C. at 794; Lovejoy v. Commissioner,18 B.T.A. 1179, 1182 (1930). *657 Since Mr. Lynch failed to specify the purpose of the $400 payment in 1971, and since he further admitted that his attorney also handled other unspecified personal work for him, we cannot find the 1971 fee to be deductible under section 212. Furthermore, the record shows that the 1972 payment was made in connection with the Cousins loan, the term of which was 16 years. Since such payment constitutes a capital expenditure, we hold that the amount of such payment is properly amortizable over the term of the loan and is not currently deductible under section 212. Accordingly, we sustain the Commissioner's determination on this issue. Accounting Fees
The next issue for decision is whether certain accounting fees paid by Gibson are deductible by the petitioners. The petitioners have conceded that such fees were paid for their benefit and constitute constructive dividends. However, they argue that the amounts should be deductible by them under section 212(3). Section 212(3) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year * * * in connection with the determination, collection, or refund of any tax." The petitioners have the burden *658 of proving that they are entitled to such a deduction. Rule 142(a); Welch v. Helvering,supra;Merians v. Commissioner,60 T.C. 187 (1973). We have concluded that the petitioners have met their burden of proving that the accounting fees are deductible. Though Mr. Lynch was unable to recall specifically each of the payments in question, he testified credibly that Mr. Wigzell was a tax accountant who prepared his tax returns and that such fees were paid to him for such services. We have no reason to doubt his testimony. Accordingly, we hold that the petitioners are entitled to deductions of $592 for 1971 and $560 for 1972 under section 212(3). Loew v. Commissioner,7 T.C. 363 (1946); cf. Greenspun v. Commissioner,72 T.C. 931, 952 (1979), affd. 670 F. 2d 123 (9th Cir. 1982). Club Dues
The next issue for decision is whether the petitioners realized a constructive dividend by reason of Gibson's payment of their membership dues in various clubs and organizations. The determination of such issue turns on whether the dues were paid primarily for corporate benefit or primarily for the petitioners' personal benefit. Loftin and Woodard, Inc. v. United States,supra.The petitioners bear *659 the burden of disproving the Commissioner's determination that such payments resulted in constructive dividends to them.Rule 142(a); Welch v. Helvering,supra.
In support of their burden, the petitioners maintain that they belonged to a number of organizations as a part of Gibson's effort to create goodwill in the community. Mr. Lynch testified that all the children of the department heads belonged to the YMCA because Gibson "felt that it was a good thing for them to be in shape." Mr. Lynch stated that Gibson did business with members of such clubs. While we do not doubt Gibson derived some benefit from the petitioners' membership in such organizations, they have failed to show that Gibson was the primary beneficiary of such expenditures. At best, the connection between such memberships and Gibson was de minimis. Accordingly, we hold that the amount of dues paid for such memberships constituted constructive dividends to the petitioners. Flight Lessons
The next issue for decision is whether Gibson's payments for Eddie Lynch's flying lessons resulted in a constructive dividend to the petitioners. The petitioners have the burden of proving that the Commissioner's determination was *660 erroneous. Rule 142(a). In support of their burden, the petitioners argue that Eddie received flight lessons for the corporate purpose of having a backup pilot. They maintain that the entire management of Gibson could have been lost if the main pilot had a heart attack. We find such argument to be unpersuasive. During the years in issue, Gibson employed two pilots, and at the same time, Eddie worked part-time in the sporting goods department. The fact that Eddie "would have been able to bring the plane down" in the event of an emergency is entirely insufficient to prove that these expenditures were other than purely personal. Sec. 262. Accordingly, we hold that the amount of such expenditures constitutes constructive dividends to the petitioners. Roofing (Flashing)
We next decide whether the replacement of flashing around the Gibson building constituted a capital expenditure. The petitioners have conceded that Gibson's payment of such expenditure resulted in a constructive dividend to them, but they maintain that such expenditure is currently deductible by them and should not be capitalized. The cost of an incidental repair which neither adds to the value of the building *661 nor appreciably prolongs its life may be deducted as an expense. Pierce Estates, Inc. v. Commissioner,16 T.C. 1020 (1951), revd. and remd. on another issue 195 F. 2d 475 (3d Cir. 1952); Illinois Merchants Trust Co. v. Commissioner,4 B.T.A. 103 (1926). However, a repair in the nature of a replacement which arrests deterioration and appreciably prolongs the life of the property is a capital expenditure subject to depreciation over its useful life. Georgia Car & Locomotive Co. v. Commissioner,2 B.T.A. 986 (1925); Simmons & Hammond Manufacturing Co. v. Commissioner,1 B.T.A. 803 (1925). "[T]he proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Oberman Manufacturing Co. v. Commissioner,47 T.C. 471, 483 (1967). The petitioners have the burden of proving that the expenditure for flashing is currently deductible. Rule 142(a); Welch v. Helvering,supra.
It appears that the original buildings were constructed in an inexpensive manner. Mr. Lynch testified that such buildings "had rather sorry roofs to begin with" and that "the second *662 contractor did a good job" in repairing such roofs. Mr. Wilmoth, the original builder, testified that a $2,500 bill for roofing in 1973 would, in his mind, constitute a major repair. We conclude that the flashing expenditure was more in the nature of a replacement which appreciably prolonged the life of the Gibson building and hold that such expenditure must be capitalized and depreciated over a 10-year period. Sec. 1.162-4, Income Tax Regs. Accordingly, we sustain the Commissioner's determination on this issue. Ice Machine
The next issue for decision is whether the purchase by Gibson of an ice machine in 1973 resulted in a constructive dividend to the petitioners. The determination of this issue turns on whether such expenditure was primarily for the benefit of Gibson or primarily for the personal benefit of the petitioners. The Commissioner argues that such machine was purchased for the Lynches' personal benefit and therefore constituted a constructive dividend to them. The petitioners have the burden of proving that the Commissioner's determination was erroneous. Rule 142(a); Welch v. Helvering,supra.We believe that they have met such burden. Mr. Lynch testified that *663 two ice machines were purchased: one for use in the store and one for their Sports Center. We find no reason to doubt such testimony. Gibson was a large discount store, and we believe it likely that such machines were used as a part of its business operation. We cannot imagine, and the Commissioner has not shown, the benefit conferred on the petitioners by reason of such purchase.The Commissioner relies on the revenue agent's analysis of the Gibson vouchers as reliable evidence that such expenditure was personal, yet no such expenditure appears on such analysis. On this record, we conclude that such expenditure was incurred for the primary benefit of Gibson and therefore did not result in a constructive dividend to the petitioners. Issue 4. Japan Trip
The next issue for decision is whether the petitioner must include in their income the fair market value of the trip to Japan awarded to them. In this connection, we must also decide whether the petitioners are taxable on $575.19 of additional payments made by Gibson on their behalf relating to such trip. The petitioners maintain that the Japan trip was related to their business and, therefore, that they should not be taxable on *664 its fair market value. They further maintain that they should not be taxable on the additional payments by Gibson which the Commissioner determined to constitute a constructive dividend to them. They argue that the inclusion of such additional amount would constitute a "doubling-up" of the income they received. The petitioners bear the burden of proving that they are not taxable on such amounts. Rule 142(a); Welch v. Helvering,supra.
It has long been established that the receipt by a taxpayer of benefits in a form other than cash may constitute income to him. Sec. 61; Commissioner v. LoBue,351 U.S. 243 (1956); Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955); Patterson v. Thomas,289 F. 2d 108 (5th Cir. 1961). Prizes and awards are specifically includable in gross income (sec. 74), and if such prize or award is not made in cash, the amount to be included in income is the fair market value of the award. Sec. 1.74-1(a)(2), Income Tax Regs.; Horung v. Commissioner,47 T.C. 428 (1967); McCoy v. Commissioner,38 T.C. 841 (1962); Downes v. Commissioner,30 T.C. 396 (1958). A review of the evidence overwhelmingly establishes that the fair market value of such trip should be *665 includable in the petitioners' income. Mr. Lynch testified that such trip was paid for by Gibson's suppliers and was based on meeting certain production (sales) requirements. He further explained that "we never * * * missed winning" such trips. Since it is clear that the trip constituted an award within the meaning of section 74, we hold that the fair market value of such trip ($1,500) is includable in the petitioners' income. The petitioners argue that the additional payments by Gibson were implicitly included in the Commissioner's determination of the trip's fair market value. We disagree. In making his determination, the Commissioner had full knowledge that Refrigerator, Sylvania, and W. D. Alexander Co. sponsored and paid for such trip, and in our view, the fact that Gibson paid additional amounts for the petitioners' benefit had absolutely no bearing on his determination of the amounts expended by the sponsors. Accordingly, we find the $575.19 to be an amount separate and distinct for the purpose of determining the amount of income on which the petitioners may be subject to tax. Whether the additional expenditures by Gibson constitute a constructive dividend to the petitioners *666 turns on whether such expenditures were made for the primary benefit of the corporation or for the primary benefit of the petitioners. Loftin and Woodard, Inc. v. United States,supra. In this light, the petitioners maintain that such expenses were incurred for business purposes and therefore are not taxable to them. The petitioners bear the burden of proving such contention. Rule 142(a); Welch v. Helvering,supra.
A review of the facts and circumstances of the Japan trip reveals that such trip was primarily for the personal benefit of the petitioners. Mr. Lynch stated: "I went on this Japan trip for my wife." He introduced no breakdown of any amounts of time that he spent on business and could not specifically recall either the business activities he engaged in or the purpose of the payments in question. Accordingly, we hold that the $575.19 of payments by Gibson resulted in additional income taxable to the petitioners. See Silverman v. Commissioner,28 T.C. 1061 (1957), affd. 253 F. 2d 849 (8th Cir. 1958). Issue 5. Business Expense
At trial, the petitioners introduced photocopies of receipts and monthly statements from American Express in what appeared to be an attempt to *667 prove that they incurred certain additional deductible business expenses. Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.However, section 274(d) imposes additional requirements for the substantiation of expenses for travel, entertainment, meals, and gifts. See Gilman v. Commissioner,72 T.C. 730 (1979); Ashby v. Commissioner,50 T.C. 409 (1968). Section 274 requires that a taxpayer substantiate "by adequate records or by sufficient evidence corroborating him own statement" the amount of the expense, the time and place of the travel or entertainment, the business purpose of the expense, and the business relationship to the taxpayer of the person entertained. Regulations promulgated pursuant to the statute provide that in order to meet the adequate records test, a taxpayer must maintain an account book, diary, statement of expense or similar record prepared contemporaneously with the expenditure, and documentary evidence of certain expenditures, such as receipts or bills. These records must be sufficient to establish each element--amount, time, place, business purpose, and business *668 relationship--of an expenditure. In the absence of adequate records to substantiate each element of an expense, a taxpayer may alternatively establish such element: (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is the description of a gift, or the cost, time, place, or date or an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence. [Sec. 1.274-5(c)(3), Income Tax Regs.] While some of the photocopies were sufficient to establish the fact that an expenditure occurred, others were illegible, and none of such documents evidenced a business purpose. Mr. Lynch made no attempt to explain any of the expenditures, *669 and he admitted that some of them were personal. While it is plausible that some of such documents evidenced expenditures which could be deductible under section 162, the petitioners have failed to provide us with any basis for making such a determination. Cf. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Furthermore, it appears that many of the expenditures constituted travel, entertainment, and meal expenses which would require further substantiation under section 274, and the courts have held on a numerous occasions that merely presenting a "blizzard" of receipts falls woefully short of meeting the requirements of such section. See Dowell v. United States,522 F. 2d 708, 714 (5th Cir. 1975); Hughes v. Commissioner,451 F. 2d 975 (2d Cir. 1971), affg. a Memorandum Opinion of this Court; Gilman v. Commissioner,supra;Rutz v. Commissioner,66 T.C. 879 (1976). We have examined the evidence and find that the petitioners have utterly failed to meet their burden of proof. Accordingly, we hold that they may not deduct any of such expenditures under either section 162 or section 274. Issue 6. Interest Deductions
The next issue for decision is whether the petitioners are entitled *670 to deduct any amounts for interest in excess of the amounts determined by the Commissioner. The basis for the Commissioner's determination was a 1978 letter from FNB to Mr. Lynch which provided that Mr. Lynch "paid" interest of $30,000.00 in 1975 and $40,997.95 in 1977. The petitioners argue that such letter is not determinative. They maintain that the terms of the Cousins loan were renegotiated and that the amounts of interest shown on a loan reduction schedule reflected the agreement of the creditor and the debtor as to the amounts to be treated as interest on the original loan. The petitioners bear the burden of proving that they are entitled to deduct such amounts as interest. Rule 142(a); Welch v. Helvering,supra.
The loan reduction schedule evidenced a loan outstanding in the amount of $728,706. Such loan carried an interest rate of 10 percent and required monthly payments of $7,500. While the schedule contained no entries and by itself would clearly be insufficient to prove the actual payment of any interest, the petitioners brought forth Jesse Gregory Winchester, the FNB commercial lending officer responsible for handling the Lynch account. After reviewing his records, *671 Mr. Winchester testified that the loan was renegotiated and that FNB regularly received payments of $7,500 per month. He further testified that such payments were applied to reduce the balance of the first mortgage (Cousins). While FNB may have handled the loan payments somewhat differently for internal accounting purposes, Mr. Winchester specifically identified the loan reduction schedule and testified that the schedule provided the proper allocation between interest and principal. Under these circumstances, we believe that the petitioners have met their burden of proof. Accordingly, we hold that the petitioners are entitled to interest deductions of $42,254.54 for 1975 and $68,999.91 for 1977. Issue 7. Filing Status - 1977
The next issue for decision is whether Mrs. Lynch is jointly liable for the deficiency for 1977. The determination of this issue is a question of fact which turns upon whether the petitioners intended to file a joint return for such year. See Federbush v. Commissioner,325 F. 2d 1, 2 (2d Cir. 1963), affg. per curiam 34 T.C. 740 (1960); Estate of Campbell v. Commissioner,56 T.C. 1, 12 (1971); Kann v. Commissioner,18 T.C. 1032, 1044-1045 (1952), affd. 210 F. 2d 247, 251-252 (3d Cir. 1953). *672 The petitioners argue that Mr. Lynch filed a separate return for 1977 and therefore that Mrs. Lynch is not liable for any deficiency for such year. The Commissioner argues that such issue was raised for the first time on brief and therefore should not be considered by this Court.The petitioners bear the burden of proving that they did not intend to file a joint return for 1977. Rule 142(a); Welch v. Helvering,supra;Howell v. Commissioner,10 T.C. 859 (1948), affd. 175 F. 2d 240 (6th Cir. 1949); see also Anderson v. United States,48 F. 2d 201 (5th Cir. 1931). The record is confusing with respect to the petitioners' intent. On the return originally filed for 1977, it was indicated that Mr. Lynch was filed as "Married filing separately." The petitioners had in past years filed joint returns. After audit, the Commissioner issued a joint notice of deficiency wherein the computed the petitioners' tax liability for 1977 based on the tax rates for married persons filing jointly. In their petition, filed in October 1980, the petitioners raised no objection to the Commissioner's computation and, in fact, admitted that Mrs. Lynch had filed a joint return with Mr. Lynch for 1977. They *673 asserted in such petition that Mrs. Lynch should be relieved of liability for such year as an innocent spouse. In April 1981, the petitioners lodged an amended return for 1977 with the IRS indicating that Mr. Lynch was filing as "Married filing separately." However, Mrs. Lynch also signed such return in the space provided for the spouse's signature. At trial, neither Mr. nor Mrs. Lynch testified as to their intent with respect to the 1977 return, and although they were allowed after trial to amend their petition to conform to the evidence, they did not raise the question of their filing status for 1977. It is well settled that this Court will not consider issues raised for the first time on brief when to do so prevents the opposing party from presenting evidence or arguments that might have been presented if the issue had been timely raised. Graham v. Commissioner,79 T.C. 415 (1982); Estate of Gillespie v. Commissioner,75 T.C. 374, 381 (1980); Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973); Riss v. Commissioner,56 T.C. at 401. It is clear that prior to the filing of the petitioners' brief the Commissioner was not aware that the petitioners intended to raise this issue. *674 The pleadings and the evidence at trial centered on whether Mrs. Lynch was entitled to relief as an innocent spouse, not on whether Mr. Lynch filed a separate return for 1977. Accordingly, we hold that such issue was raised untimely. Nonetheless, we have in fact examined the merits of the petitioners' arguments and find that there is no basis for rejecting the Commissioner's determination. Rule 142(a).
Issue 8. Innocent Spouse
The next issue for decision is whether Mrs. Lynch is entitled to be relieved of liability for the deficiencies as an innocent spouse within the meaning of section 6013(e). The petitioners concede that Mrs. Lynch cannot qualify as an innocent spouse for 1972. They have not argued, and accordingly concede, that she is ineligible for relief for 1973. For 1977, they argued that they did not file a joint return, but we have found such argument to be both untimely and meritless. Thus, the years open for consideration under section 6013(e) include 1971, 1975, and 1977. Section 6013(e) provides, in part: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made *675 under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. In order to obtain the benefit of such statute, a putative innocent spouse bears the burden of proving that all three of the conditions of section 6013(e)(1) have been met. Rule 142(a); Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971).However, *676 after considering all the evidence, we find that Mrs. Lynch fails to meet the requirements of section 6013(e)(1)(B) and (C) and accordingly is not eligible for relief under such section as an innocent spouse for any of the years in issue. To satisfy the requirements of section 6013(e)(1)(B), a spouse must prove that she did not have actual knowledge of the omission of income and that she had no reason to know of such omission.Thus, it is not enough for Mrs. Lynch to show that she lacked actual knowledge of the omission, but she must also show that she had no reason to know of the omission. See Adams v. Commissioner,60 T.C. 300 (1973); Sonnenborn v. Commissioner,supra. To show that she had no reason to know of the omission, she must convince the Court that a reasonably prudent person with her knowledge of the surrounding circumstances would not have known of the omission. Sanders v. United States,509 F.2d 162, 166 (5th Cir. 1975). Where the facts of a transaction are in the possession of the spouse seeking relief, or reasonably within her reach, her lack of knowledge of the legal tax consequences of such transaction is insufficient to base a claim for relief under section 6013. *677 McCoy v. Commissioner,57 T.C. 732, 734 (1972); see also Quinn v. Commissioner,524 F. 2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Smith v. Commissioner,70 T.C. 651, 673 (1978). Furthermore, "a spouse cannot close her eyes to * * * facts, that might give her reason to know of the unreported income." Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 699 (1972). During 1971, Mrs. Lynch was actively engaged in the business affairs of Gibson. She worked fulltime for Gibson where she signed payroll checks, went on buying trips, worked as a floor walker, took inventory, and ran errands. With respect to the bargain purchase of the Gibson property, she testified that she had no knowledge of the financial details of such transaction. Yet, she did know that Mr. Lynch was trying to get a loan, and there is no persuasive evidence in the record indicating that Mr. Lynch was secretive with respect to the purchase of the Gibson property. There is no proof that she did not know of the purchase of the Gibson property and the price paid for it. Thus, we must conclude that she had reason to know, if not actual knowledge of, the bargain purchase.The *678 fact that Mrs. Lynch may not have been aware of the tax consequences of the purchase of such property is not determinative (McCoy v. Commissioner,supra) and does not negate the fact that the petitioners reaped a financial benefit by reason of such purchase. Mrs. Lynch was an intelligent person, and we believe that she also had actual knowledge or reason to know of the various corporate payments made on behalf of the Lynches during 1971 (i.e., club dues, YMCA, flight lessons). Hence, we conclude that Mrs. Lynch failed to qualify as an innocent spouse for 1971. Sanders v. United States,supra.
With respect to 1975 and 1977, Mrs. Lynch knew that Mr. Lynch owned the Gibson land and building; thus, she had reason to know that they had the right to receive income from such property in the form of rent. Since the business operations at the store were continued by Center after Gibson filed a petition in bankruptcy, Mrs. Lynch had reason to believe that Mr. Lynch's right to the income from such property also continued. Yet, the bulk of such income was omitted from their returns. Since she had reason to know of such omissions, we hold that she fails to qualify as an innocent spouse for *679 either 1975 or 1977. Moreover, Mrs. Lynch has failed to prove that she satisfies the requirement of section 6013(e)(1)(C). To meet that requirement, she must show that it would be inequitable to hold her liable for the deficiencies for 1975 and 1977. It is true that the omission of income in those years may have been due to the lack of knowledge of the tax consequences of the constructive receipt of rental income by Mr. Lynch; yet, under the law, Mr. Lynch is taxable on such income irrespective of whether he was aware of such tax consequences, and in like manner, it is not inequitable to tax Mrs. Lynch on such income even though she was unaware of such tax consequences. See McCoy v. Commissioner, supra.
Issue 9. Income Averaging
The next issue for decision is whether the petitioners are entitled to average their income for 1971, 1972, and 1973. Specifically, the controversy centers on whether the petitioners have properly established their correct taxable income for each of the base period years. They assert that their returns for all of the base period years except 1968 were jointly stipulated to and that no challenge has been made as to their validity. They further maintain *680 that their income for 1968 was adequately established at trial through Mr. Lynch's testimony and the corporate returns and records for that year. In opposition, the Commissioner maintains that he was not afforded an opportunity to adequately examine the petitioners' returns for such base period years and that the petitioners' evidence is insufficient proof of their correct taxable income for such years. The Commissioner concedes that the petitioners are entitled to income averaging for 1975 and 1977. Sections 1301 through 1305 provide income averaging for an eligible individual whose taxable income for the year in which averaging is elected (the computation year) exceeds 120 percent of his average taxable income [9] *681 in the 4 preceding years (base period years). In order for the petitioners' tax liability to be computed under the income averaging provisions, the correct taxable income for the base period years must first be determined. Thus, the question of whether the petitioners are entitled to average their income for 1971 turns on whether they adequately establish their correct taxable income in each of the base period years. See Unser v. Commissioner,59 T.C. 528 (1973). We believe they have met such burden. We cannot agree with the Commissioner's contention that he was not provided an opportunity to examine the petitioners' returns for the base period years. The issue of income averaging for the years 1971 through 1973 was raised by the petitioners more than 2 years prior to trial. Thus, the Commissioner was well aware of the petitioners' intention to put such matter in issue. Furthermore, the parties stipulated to the petitioners' returns for 1967, 1969, and 1970 prior to trial, and during the trial, the Commissioner failed to challenge the validity of any of the items contained in such returns. We can find no reason to doubt the accuracy of such returns. Therefore, we conclude that such returns are sufficient to establish the petitioners' base period income for purposes of income averaging. Cf. McCaskill v. Commissioner,77 T.C. 689, 695 (1981). The petitioners did not introduce a copy of their return for 1968. Mr. Lynch *682 testified that he made a diligent effort to locate a copy of such return but could not find one and that the accountant who prepared such return was dead. Mr. Lynch also testified that his salary was $25,000 in 1968. His testimony was corroborated by the resolution of the Gibson board to fix his salary at $25,000. A copy of Gibson's corporate return for 1968 was introduced which indicated that Mr. Lynch's total compensation for 1968 was $34,166.72. Mr. Lynch testified credibly that he was not employed by anyone else in 1968 and had no other items of income differing substantially from those items reports on his returns for 1967 and 1969. In cases where a taxpayer's correct taxable income is at issue, we have examined the record as a whole and have accepted testimonial evidence to establish base period income where such testimony is credible. Abernathy v. Commissioner,T.C. Memo. 1978-370; Ryza v Commissioner,T.C. Memo. 1977-64. Although the petitioners did not produce their return for 1968, we find Mr. Lynch's testimony to be credible and amply supported by other documentary evidence. On brief, the petitioners stated that they were willing to forego the personal exemptions *683 and any other deductions for 1968 to which they may be entitled for the purpose of income averaging. Under such circumstances, we hold that the petitioners' taxable income in 1968 for purposes of the income averaging computation was $35,000. Issue 10. Failure to Timely File
The next issue for decision is whether the petitioners are liable for the addition to tax under section 6651(a)(1) for failure to file timely their return for 1973. Such section provides that for failure to file a return on the date prescribed, there shall be due an addition to tax of up to 25 percent of the tax required to be shown on the return, unless it is shown that such failure to file is due to reasonable cause and not willful neglect. The petitioners have the burden of showing reasonable cause for their untimely filing. Rule 142(a); BJR Corp. v. Commissioner,67 T.C. 111, 131 (1976); Elliott v. Commissioner,40 T.C. 304, 315 (1963). The petitioners argue that they were not conversant in tax matters and that they relied on their accountant to prepare their return and to seek extensions for the filing of such return. We find such arguments to be insufficient to establish reasonable cause. This is not *684 a case of a taxpayer's reliance upon professional advice in relation to a question of tax law that may, in certin circumstances, furnish reasonable cause for the failure to file a return or for a late filing. See Burton Swartz Land Corp. v. Commissioner,198 F. 2d 558 (5th Cir. 1952), revg. on this issue a Memorandum Opinion of this Court; Nelson v. Commissioner,19 T.C. 575 (1952). The reliance here centers only upon the petitioners' employment of such accountant for the ministerial acts of preparing and filing the return. Reasonable cause for the failure to timely file the return cannot be established merely by stating that such return was in the hands of the agent. Logan Lumber Co. V. Commissioner,365 F. 2d 846, 854 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court. The evidence reveals that the petitioners' accountant previously applied for and received three extensions of time in which to file their return for 1973. Such extensions allowed the return to be filed as late as September 30, 1974.Yet, the return was not filed until November 18, 1974, 49 days after the expiration of the extended period. Since the petitioners failed to establish reasonable *685 cause for such additional delay in filing, we hold that they are liable for the addition to tax under section 6651(a)(1). Issue 11. Negligence
The next issue for decision is whether the petitioners are liable for the addition to tax under section 6653(a), relating to negligence. Such section provides, in part: If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment. The petitioners bear the burden of proving that they are not liable for such additions to tax. Rule 142(a); Bixby v. Commissioner,58 T.C. 757, 791 (1972). The petitioners argue that such additions to tax should not be imposed on them due to the existence of "legal complexities * * * on which honest men could disagree." We disagree. During the years in issue, Gibson paid for many of the petitioners' personal expenses and sold the Gibson property to Mr. Lynch at a price which was substantially less than its fair market value. The petitioners failed to include such items as income on their returns. In addition, they failed to report certain other items of ordinary income and capital *686 gains and erroneously claimed identical losses in two successive years with respect to the same stock. These acts and omissions constitute negligence within the meaning of section 6653(a). Accordingly, we hold that the petitioners are liable for the additions to tax under section 6653(a) and sustain the Commissioner's determination on this issue. Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. For convenience, Gibson will be used to refer to the corporation and the store itself.↩
3. Both IMC and Cousins were subsidiaries of Cousins Properties.↩
4. Such amount consists of the $50,000 investment by Mr. Lynch and the $52,000 investment by Mr. Barrett. The Barrett stock was repurchased for $600,000 in 1969 and kept on the books as treasury stock.
5. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
6. In reaching this conclusion, we have considered the testimony of the experts and their appraisal reports and have concluded that the fair market value of the land was $30,000 per acre, or $189,000, and that the fair market value of the building was $747,500. Furthermore, we hold that the petitioners are entitled to depreciate such building over a 25-year useful life.↩
7. For the first time on brief, the petitioners argue that the distribution of the property to Mr. Lynch did not result in a constructive dividend until 1972. Such argument is wholly without merit. The parties stipulated that the property was transferred by Gibson to Mr. Lynch on December 23, 1971, and the evidence in the record amply supports such fact. The warranty deed transferring title to Mr. Lynch was executed, delivered, and recorded in 1971 in full accordance with Georgia law. See Ga. Code Ann. sec. 44-5-30↩ (1982), and cases cited thereat.
8. In Baumer v. United States,580 F. 2d 863, 877 (1978), the Court of Appeals for the Fifth Circuit declared: These expansive principles governing the treatment of constructive dividends reflect an awareness by Congress and the courts of the ingenious methods which have been devised by owners of closely held corporations trying to escape taxes at the corporate or shareholder level. "Instances of 'constructive' or 'disguised' distributions are commonly encountered in the context of closely held corporations whose dealings with their stockholders are, more often than not, characterized by informality." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 7-24 (3d ed. 1971). As a consequence, courts have generally examined dealings between a closely held corporation and its shareholders or relatives of shareholders with a jaundiced eye and microscopic vision. Such transactions are simply not entitled to the presumption that they are conducted at arm's length. Indeed, they call for special scrutiny. We suggest that the metaphor of a corporation and its sole shareholder walking arm-in-arm is more descriptive of reality than the vision of the corporation and shareholder holding each other apart at arm's length.↩ [Footnote omitted; emphasis added.]
9. Aveage base period income is one-fourth of the sum of the base period incomes for the base period. Sec. 1302(b)(1). The base period is defined as the 4 taxable years immediately preceding the computation year. Sec. 1302(c)(2).